UNITED STATES of America

v.

Clifford BAILEY, Appellant.

UNITED STATES of America

v.

Ronald Clifton COOLEY, Appellant.

UNITED STATES of America

v.

Ralph WALKER, Appellant.

Nos. 77–1404, 77–1413 and 77–1502.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 5, 1977.

Decided July 12, 1978.

As Amended July 12 and 14, 1978.

Rehearing Denied Oct. 19, 1978.

David A. Levitt, Watertown, Mass. (appointed by this court), for appellant in No. 77–1404.

Robert A. Robbins, Jr., Washington, D.C. (appointed by this court), for appellant in No. 77–1413.

John Townsend Rich, Washington, D.C. (appointed by this court), for appellant in No. 77–1502.

David G. Hetzel, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., and John A. Terry and Steven R. Schaars, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee. William D. Pease and James F. Hibey, Asst. U.S. Attys., Washington, D.C., also entered appearances for appellee.

Before WRIGHT, Chief Judge, and McGOWAN and WILKEY, Circuit Judges.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

Dissenting opinion filed by Circuit Judge WILKEY.

J. SKELLY WRIGHT, Chief Judge:

Appellants in these criminal jury cases were convicted of violating 18 U.S.C. § 751(a) (1976) [1] by escaping "from the custody of the Attorney General" when they departed from the New Detention Center of the District of Columbia Jail ("Northeast One") in the early morning hours of August 26, 1976. Appellants Bailey and Walker had been brought from federal prisons where they were serving sentences for federal crimes to the D.C. Jail pursuant to writs of *habeas corpus ad testificandum* issued by the Superior Court of the District of Columbia [2]; appellant Cooley was serving a sentence in the D.C. Jail for a federal crime. Appellants raise various issues, both individually and in common, but only two

---

1. **§ 751. Prisoners in custody of institution or officer**

 (a) Whoever escapes or attempts to escape from the custody of the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General, or from any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or magistrate, or from the custody of an officer or employee of the United States pursuant to lawful arrest, shall, if the custody or confinement is by virtue of an arrest on a charge of felony, or conviction of any offense, be fined not more than $5,000 or imprisoned not more than five years, or both; or if the custody or confinement is for extradition or by virtue of an arrest or charge of or for a misdemeanor, and prior to conviction, be fined not more than $1,000 or imprisoned not more than one year, or both.

 Appellants were also charged with violating 22 D.C.Code § 2601 (1973), the "local" statute defining the offense of "prison breach." The jury was instructed that if they found the defendants guilty as charged under the federal escape statute, they should not consider the charge under the D.C.Code. Tr. 804.

2. Courts issue writs of *habeas corpus ad testificandum* when it is necessary to bring a person who is confined in a prison or jail (usually serving a sentence for a previous conviction) into court to testify in a pending case. *See generally Ex parte Bollman,* 8 U.S. (4 Cranch) 75, 97, 2 L.Ed. 554 (1807) (Marshall, C. J.); 3 W. Blackstone, Commentaries * 129–131. Appellants were brought to the District to testify in a case pending before the Superior Court.

require extended discussion[3]: whether the trial court erred in refusing to let the jury consider whether evidence of threats, assaults, and conditions in the jail either negated the intent required to commit the crime of escape or provided a defense of duress, and whether the prosecution's evidence and the trial court's instructions were adequate on the issue of whether appellants were in the custody of the Attorney General by virtue of the convictions alleged in the indictment. We conclude that appellants are entitled to a new trial because the trial court did not properly instruct the jury as to what constitutes an "escape" and excluded relevant evidence from the jury's consideration. We also find that the trial court's instructions on the custody element were in some respects confusing and potentially misleading, but these problems will presumably be corrected in the new trial.

I

Appellants first contend that the trial judge erred in refusing to let the jury consider certain allegedly exculpatory evidence. The evidence in question sought to establish that there were frequent fires in the D.C. Jail where appellants were confined, set by both inmates and guards, and often allowed to burn while the inmates suffered from lack of proper ventilation,[4] that appellants had been threatened with physical violence by guards,[5] that appellants Bailey and Cooley had actually been beaten by guards,[6] that appellant Walker had epilepsy and had received inadequate medical treatment for his condition,[7] and that appellant Cooley had been forced by his co-appellants to leave the jail.[8] Appellants argued in the District Court and assert again on appeal that this evidence was relevant either as negating the specific intent they claim is required as an element of the crime of escape or as establishing a defense of duress.

The trial court admitted this evidence during the trial, but effectively precluded the jury from considering it with regard to intent by holding that the crime of escape requires only general, rather than specific, intent.[9] The court also refused to allow the jury to consider the defense of duress, holding that the duress defense is available only when the person asserting it turns himself in, and that this prerequisite was absent in appellants' cases as a matter of law.[10]

3. For a brief discussion of the other issues, see note 68 infra.

4. See, e. g., Tr. 150–152, 161–163, 168, 371, 377–378, 381, 390, 415, 547.

5. See, e. g., Tr. 154, 368–370, 389–394, 411, 469–473.

6. See, e. g., Tr. 368, 373–375, 404–405, 412, 475–478. Appellants Bailey and Walker were in the D. C. Jail pursuant to writs of habeas corpus ad testificandum so that they could testify in a criminal case in the Superior Court of the District of Columbia. Some of the alleged threats and abusive treatment were allegedly attempts by corrections officers to affect their testimony. As a result of this treatment appellant Bailey filed a suit in Superior Court against various guards, but the abusive treatment allegedly continued after the suit was filed. See, e. g., Tr. 529–533.

7. See, e. g., Tr. 438–458, 603–604, 625, 650–652, 678–680; appellant Walker's Exhibit 2–A.

8. See Tr. 404–405.

9. Tr. 773. See text at note 22 infra. Any doubt the jurors may have had as to the relevance of appellants' evidence to the issue of intent as defined by the trial court would have been resolved by the following instruction given by the court at the end of the case:

Now, ladies and gentlemen, the question has been raised during the course of this trial as to conditions at the District of Columbia Jail. I wish to say this to you with respect to that institution:

You are instructed as a matter of law that conditions at the District of Columbia Jail or the new detention center, no matter how burdensome or restrictive an individual inmate may find them to be, are not a defense to the charges in this case, nor justification for the commission of the offense of escape.

Tr. at 806. Furthermore, when the same judge later presided at the trial of a related case, he refused even to admit this type of evidence. See United States v. Cogdell, 190 U.S.App.D.C. —, — n.2, 585 F.2d 1130, 1132 n.2 (D.C. Cir. 1978).

10. See text and note at note 43 infra.

## A. Intent

Our consideration of the relevance of the evidence in question to the elements of the crime of escape under 18 U.S.C. § 751(a) leads us to agree with the Seventh Circuit in *United States v. Nix*, 501 F.2d 516 (7th Cir. 1974), that a great deal of unnecessary confusion has been generated by the use of ill-defined terms and concepts such as "specific" and "general" intent.[11] Much of this unhelpful complexity can be avoided by returning to basic principles—beginning with a clear definition of the crime of escape and proceeding to consider the proper roles of prosecution, defense, court, and jury in trying escape cases.

 Consciously ignoring labels such as "specific" and "general" intent, the court in *Nix* concentrated on "what constitutes the 'escape' element of the crime." 501 F.2d at 518. Although "escape" is usually treated as a single element of the offense defined in Section 751(a), the word "escape"—like many other legal terms [12]—is not self-defining. A jury needs more instruction than this one word if it is properly to consider whether a defendant has "escaped." The Seventh Circuit found that "[m]ost courts, confronted with evidence that a defendant could not or did not form *an intent to leave and not to return*, have held such an intent essential to proof of the crime of escape." *Id.* (emphasis added).[13] The court then concluded that this "close to unanimous" approach of the courts was justified by "the desire to have one human element of 'blameworthiness' as a basis for punish-

11. *See United States v. Nix*, 501 F.2d 516, 518 (7th Cir. 1974); W. LaFave & A. Scott, Handbook on Criminal Law 201–202 (1972).

The dissent characterizes the court's opinion as a "bouleversement" that would create chaos in place of the alleged stability of traditional categories of criminal law—in large part because the court deals with the evidence at issue in this case under the rubric of "intent" as well as that of duress or necessity. The essential differences between the court and the dissent center around the proper roles of judge and jury, *see* note 28 *infra*, and are hardly so far-reaching as the dissent's rhetoric suggests. Furthermore, the dissent exaggerates the stability of the law with regard to the defenses of duress and necessity. The rigid restrictions on the availability of these defenses upon which the dissent relies have been rejected by several modern statutes, including the Model Penal Code, and by several courts in escape cases. *See, e. g., People v. Unger*, 66 Ill.2d 333, 5 Ill.Dec. 848, 362 N.E.2d 319 (1977); *People v. Luther*, 394 Mich. 619, 232 N.W.2d 184 (1975); *People v. Harmon*, 53 Mich.App. 482, 220 N.W.2d 212 (1974); American Law Institute, Model Penal Code §§ 2.09 (Duress), 3.02 (Justification Generally: Choice of Evils) (Proposed Official Draft 1962); Hawaii Rev. Laws § 249–5 (1955); Ill.Rev.Stat., ch. 38, § 7–13 (1975). *See also* text and notes at notes 29–52 *infra*. The dissent's accusation that the court is relying on "intent" because these other defenses are clearly unavailable on the facts of this case is thus without foundation.

12. For example, the legal term "rape" is defined as "[t]he unlawful carnal knowledge of a woman by a man forcibly and against her will." Black's Law Dictionary 1427 (4th ed. 1957). And the term "burglary" is defined as "[t]he breaking and entering the house of another in the nighttime, with intent to commit a felony therein, whether the felony be actually committed or not." *Id.* at 247.

13. *United States v. Nix, supra* note 11, 501 F.2d at 518–519, *citing, inter alia, United States v. Snow*, 157 U.S.App.D.C. 331, 484 F.2d 811 (1973); *United States v. Chapman*, 455 F.2d 746 (5th Cir. 1972); *United States v. McPherson*, 436 F.2d 1066 (5th Cir.), *cert. denied*, 402 U.S. 997, 91 S.Ct. 2181, 29 L.Ed.2d 163 (1971); *Chandler v. United States*, 378 F.2d 906 (9th Cir. 1967); *Gallegos v. People*, 159 Colo. 379, 411 P.2d 956 (1966); *People v. Dolatowski*, 94 Ill.App.2d 434, 237 N.E.2d 553 (1968); *State v. Pace*, 192 N.C. 780, 136 S.E. 11 (1926); *State v. Hendrick*, 164 N.W.2d 57 (N.D. 1969); *State v. Lakin*, 131 Vt. 82, 300 A.2d 554 (1973). *See also Helton v. State*, 311 So.2d 381 (Fla.App. 1975); *Lewis v. State*, 318 So.2d 529 (Fla.App. 1975), *cert. denied*, 334 So.2d 608 (Fla. 1976). Cases representing the minority view include *People v. Siegel*, 198 Cal.App.2d 676, 18 Cal. Rptr. 268 (1961); *People v. Haskins*, 177 Cal. App.2d 84, 2 Cal.Rptr. 34 (1960); *State v. Wharff*, 257 Iowa 871, 134 N.W.2d 922 (1965). Describing the requisite intent for escape as an "intent to leave and not to return" is not completely satisfactory since it might not cover a prisoner who intends to take an unauthorized temporary leave of absence. The Seventh Circuit's own version of the intent requirement, "an intent to avoid confinement," 501 F.2d at 519, captures the sense of these cases while avoiding the leave of absence loophole. *See* text and note at note 17 *infra*.

ment"[14] and because "a prisoner who has no intent to escape—because he is grossly intoxicated, or thinks his jailer has told him to leave, or mistakes the boundaries of his confinement, or has a gun held to his head by another inmate—is not likely to endanger society, as a wilful escapee is." *Id.* at 519.

On the basis of its review of precedents and policies, the Seventh Circuit defined "escape" for purposes of Section 751(a) as "a voluntary departure from custody with an intent to avoid confinement." *Id.* Following the Seventh Circuit's analysis, we conclude that an "escape" occurs when a defendant (1) leaves custody (2) voluntarily,[15] (3) without permission,[16] and (4) with an intent to avoid confinement.[17]

In order to convict a defendant of escape, the prosecution must prove each of these factors beyond a reasonable doubt. In the ordinary case the prosecution can

**14.** *United States v. Nix, supra* note 11, 501 F.2d at 519, *quoting* Note, *Criminal Attempts—The Rise and Fall of an Abstraction,* 40 Yale L. J. 53, 69 (1930).

**15.** *See, e. g., United States v. Snow, supra* note 13.

**16.** This factor, though not explicitly stated in the *Nix* definition, was clearly implied. It is a generally recognized element of the definition of "escape" and was included in the trial court's definition in this case when the jury was instructed that appellants' departures must be "unauthorized." *See* Tr. 802.

**17.** The dissent fastens on the words "intent to avoid confinement" and would *either* reduce them to a statement of "general intent" indistinguishable from the "consciously and not inadvertently or by accident" instruction given by the trial court, *or* expand them to "intent to avoid confinement *permanently.*" *See* dissent, 190 U.S.App.D.C. at ——, 585 F.2d at 1126–1127 (emphasis in original). Neither of these extreme interpretations is appropriate. The word "confinement" describes the most common form of punishment prescribed by our legal system. Jurors are readily aware that a person serving a sentence for a crime is "confined"—*i. e.,* his liberty is restricted—in certain fundamental ways. For example, he cannot leave the institution wherein he is confined, he cannot come and go as he pleases, his daily schedule is subject to various controls, his privacy is substantially curtailed, and he is subject to strict discipline. One who leaves custody without permission to see his mother who is ill or to improve his menu (assuming the prison fare is within reason) has an intent to avoid confinement since restricted contact with relatives and a reasonably limited choice of diet are normal incidents of confinement. Furthermore, a prisoner who leaves custody to take even a temporary "leave of absence" from the normal conditions of confinement possesses the requisite intent for escape. On the other hand, if a prisoner offers evidence to show that he left confinement *only* to avoid conditions that are not normal aspects of "confinement"—such as beating in reprisal for testimony in a trial, fail-

ure to provide *essential* medical care, or homosexual attacks—the intent element of the crime of escape may not be satisfied. When a defendant introduces evidence that he was subject to such "non-confinement" conditions, the crucial factual determination on the intent issue is thus whether the defendant left custody only to avoid these conditions or whether, in addition, the defendant *also* intended to avoid confinement. In making this determination the jury is to be guided by the trial court's instructions pointing out those factors that are most indicative of the presence or absence of an intent to avoid confinement. *See* text and notes at notes 20–21 *infra.*

Appellant Walker argues further that in order to violate § 751 a defendant must have the requisite intent *at the time he leaves custody.* Brief for appellant Walker at 40–43. He argues that § 751 should not be used to convict a prisoner who *leaves* with permission or without an intent to avoid confinement, noting that Congress has specifically provided a separate offense for one class of such prisoners—those on furlough who fail to return as prescribed. *See* 18 U.S.C. § 4082(c) (1976). Courts addressing this issue have not favored appellants' position. *See, e. g., United States v. Michelson,* 559 F.2d 567, 570–571 (9th Cir. 1977); *United States v. Spletzer,* 535 F.2d 950 (5th Cir. 1976); *United States v. Joiner,* 496 F.2d 1314 (5th Cir.), *cert. denied,* 419 U.S. 1002, 95 S.Ct. 321, 42 L.Ed.2d 278 (1974); *United States v. Woodring,* 464 F.2d 1248, 1250 (10th Cir. 1972); *United States v. Chapman, supra* note 13, 455 F.2d at 749; *Chandler v. United States, supra* note 13, 378 F.2d at 908. We are sympathetic with the concern expressed in these cases that a prisoner should not be allowed to remain at large with impunity simply because his initial departure did not under the circumstances constitute a crime. We therefore agree that the trial court should instruct the jury that a prisoner who lacks the intent to avoid confinement at the time he leaves custody may nevertheless commit the crime of escape if he later forms this intent and therefore fails to report to the authorities or to turn himself in. *See also* text and note at note 43 *infra.*

establish a *prima facie* case that a defendant "escaped" by offering evidence that the defendant departed from custody without permission. Absent any additional evidence introduced by the defendant, such a case can be submitted to the jury with the instruction that the jury may infer the defendant's intent from the circumstances.[18] The defense has the opportunity, however, to submit additional evidence tending to negate any essential aspect of the offense. For example, a jury can consider whether evidence of jail conditions, threats, and violence such as that presented by appellants in the District Court raises reasonable doubts concerning a defendant's capacity to act "voluntarily," or his intent to avoid confinement.[19]

The prosecution then has the opportunity to rebut the defense's evidence. The prosecutor can offer evidence of any circumstances or behavior inconsistent with the defendant's exculpatory contentions. Depending on that evidence, a prosecutor may argue that the conditions allegedly necessitating the defendant's departure from custody were relatively mild, that alternative remedies short of escape (*e. g.*, resort to prison authorities or the courts) were available, or that the defendant failed to return voluntarily to custody once the conditions allegedly motivating the escape no longer threatened him. If the defendant takes the stand in his own defense, the prosecutor can inquire why he did not return voluntarily and can test the credibility of his defense by the rigors of cross-examination.

Finally, when instructing the jury on the elements of the offense charged, the judge should direct the jurors' attention to those considerations that require special emphasis. In addition to specifying the major indicia of voluntariness and intent—the immediacy, specificity, and severity of any alleged threats or fears, the availability of viable alternatives to unauthorized departure, and the defendant's decision whether and when to return to custody—the court should remind the jury of the inevitable difficulties associated with prison discipline[20] and of the possible biases of defense and prosecution witnesses testifying with respect to that aspect of the case.[21] It is the jury, however, that must make the final determination whether the prosecution has met its burden of proving each of the elements of the crime beyond a reasonable doubt. The court may not, as the District Court did in this case, take upon itself the responsibility for making this determination.

Our analysis of the law of escape indicates that the District Court erred in its definition of the offense and consequently precluded the jury's consideration of evidence that was relevant to an essential element of the crime. The trial judge instructed the jury that a defendant "escaped" if he "without authorization did absent himself from his place of confinement." Tr. 802. Relying on the opinion of the Tenth Circuit in *United States v. Woodring*, 464 F.2d 1248, 1251 (10th Cir.

---

18. The jury must of course still apply the "beyond a reasonable doubt" standard to this inference. *See In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

19. In order to be entitled to a special instruction on whether his intent to avoid confinement was negated by evidence of conditions in the jail, a defendant must, of course, introduce some evidence of these conditions. Since the evidence offered by appellants in this case was clearly "substantial," we need not decide the minimum threshold of evidence necessary to entitle a defendant to this instruction. *See generally United States v. Nix*, *supra* note 11, 501 F.2d at 519–520; *United States v. Grimes*, 413 F.2d 1376 (7th Cir. 1969); *Womack v. United States*, 119 U.S.App.D.C. 40, 336 F.2d 959

(1964); *Tatum v. United States*, 88 U.S.App. D.C. 386, 391, 190 F.2d 612, 617 (1950).

20. Such an instruction should also indicate the general boundaries between what is and is not "confinement." *See* note 17 *supra*.

21. *Cf. United States v. Sheppard*, 186 U.S.App. D.C. 283, 287, 569 F.2d 114, 118 (1977) (in a rape case, "[w]here the motivation of the complainant in bringing the charge is an issue, as in a case where the defendant contends that she consented to the intercourse, the defense attorney is free to emphasize to the jury the dangers of falsification, and the judge should instruct the jury as to those dangers and the difficulty of establishing consent").

1972), the trial judge told the jury that only a "general intent" was required to commit the crime of escape, and that this "means only that a defendant has the purpose to do something, the will to do the act. It means the act was done consciously and not inadvertently or accidentally." Tr. 803. *Woodring* is weak authority for the proposition that escape under 18 U.S.C. § 751 requires only "general" intent, since the court's entire "discussion" of the issue is limited to the following cryptic and conclusory reference:

> The instruction on specific intent is not erroneous where willfulness is in the indictment. *Even though specific intent is not an element of § 751(a)*, specific intent became the law of the case when the Court gave Instruction 11 ["specific in-

tent must be proved before there can be a conviction"]. * * *

464 F.2d at 1251 (emphasis added).[22] As indicated above, we find the Seventh Circuit's careful analysis in *United States v. Nix* much more persuasive authority.[23]

The District Court's attachment to a definition of "escape" that would effectively prevent the jury from considering the evidence of conditions in the jail, assaults, and threats in relation to appellants' intent reflects a line of cases in which courts, moved by fears of undermining prison discipline or encouraging mass escapes, have hesitated to allow juries even to consider such allegedly exculpatory evidence in escape cases unless various rigorous conditions have been satisfied.[24] We find no adequate justification

**22.** The indictment in this case also alleged that appellants "did unlawfully and *wilfully* flee and escape" from custody. R. 32 (emphasis added).

**23.** The dissent attempts to distinguish the *Nix* case by limiting that case to its facts and asserting that it holds only that intoxication may negate "general" as well as "specific" intent. Dissent, 190 U.S.App.D.C. at ——, 585 F.2d at 1124–1125. This interpretation of the *Nix* opinion is untenable. Condemning the categorical rule that the relevance of such exculpatory factors as intoxication, coercion, and mistake depends on the mechanical and artificial classification of a crime as involving either specific or general intent, the Seventh Circuit rejected the specific/general intent terminology altogether and expressly refused to declare whether escape required "general" or "specific" intent. 501 F.2d at 518. Instead, the court followed a less categorical approach similar to that urged by some leading commentators, *see* W. LaFave & A. Scott, *supra* note 11, at 344: it focused on defining the intent element of the crime of escape and held (1) that a jury must be properly instructed as to this element, and (2) that if the defendant introduces adequate evidence of intoxication, the court should instruct the jury that it must consider whether the defendant was so intoxicated that he could not form the requisite intent. The *Nix* court did not limit its discussion to intoxication, but indicated its view that such factors as coercion and mistake could also negate the intent element of the crime of escape. *See, e. g.,* 501 F.2d at 518 ("Whenever intoxication (or coercion or mistake) is raised as a mitigating factor, use of the 'specific' and 'general' intent labels interferes with the crucial analysis a court should make in escape cases: what constitutes the 'escape' element of the crime?"). We do no more than

accept the *Nix* court's holding that "escape" includes an "intent to avoid confinement" and outline how a court and jury should consider evidence of extreme conditions, unrelated to normal confinement, that is relevant to the existence of that intent. The procedures we adopt closely parallel those adopted by the court in *Nix. See id.* at 519–520. While the dissent seems willing enough to accept the "modern and ascendant view" with respect to *intoxication* in order to "distinguish" *Nix*, it is apparently unwilling to apply the basic principle underlying that "modern and ascendant view" to the facts of this case. Instead the dissent prefers to adhere to the mechanical specific/general intent terminology specifically rejected in *Nix* and to rely on such weak authority as the *Woodring* case, *see* text and note at note 22 *supra*, for the proposition that escape is a general intent crime. *See* dissent, 190 U.S.App.D.C. at —— & n.84, 585 F.2d at 1124 & n.84.

**24.** Some of the older cases would exclude such evidence altogether. *See, e. g., People v. Whipple*, 100 Cal.App. 261, 279 P. 1008 (1929). Other cases have treated such evidence as relevant to duress or necessity defenses and have imposed rigid limits on the availability of these defenses. *See, e. g., People v. Lovercamp*, 43 Cal.App.3d 823, 118 Cal.Rptr. 110 (1974); *State v. Green*, 470 S.W.2d 565 (Mo. 1971), *cert. denied*, 405 U.S. 1073, 92 S.Ct. 1491, 31 L.Ed.2d 806 (1972); *Grubb v. State*, 533 P.2d 988 (Okl. Cr.App. 1975); *State v. Worley*, 265 S.C. 551, 220 S.E.2d 242 (1975). *See generally* Annot., *Duress, Necessity, or Conditions of Confinement as Justification for Escape from Prison*, 69 A.L.R.3d 678 (1976). Courts adopting a more flexible approach include: *People v. Unger, supra* note 11; *People v. Luther, supra* note 11; *People v. Harmon, supra* note 11.

for this special broad proscription against admission of such probative defense evidence relating to intent. Juries are accustomed to determining the intent of alleged criminals, and we see nothing in the context of prosecutions for escape that requires the court to risk denying the defendants a fair trial by denying the jury its normal function. Those escape cases in which juries have been allowed to consider exculpatory evidence offer no support for fears that jurors are unable reasonably to consider all the aspects of escape cases or that juries will render decisions that will "encourage" escapes.[25] In fact, the assumptions underlying the special restrictions on defense evidence in escape cases appear to be pure speculations without any empirical support in either the case law or the scholarly literature. On the other hand, the pernicious consequences of the restrictive rules are all too clear from the reported cases.[26] As we have explained above, the proper approach is to inform the jury of those considerations that are relevant to its deliberations, not to take the issue out of its hands.[27] In our

view allowing the jury to perform its accustomed role in escape cases may make those responsible for prison conditions more conscious of their responsibilities and may well lead to fewer, rather than more, escapes. *See People v. Harmon*, 53 Mich.App. 482, 220 N.W.2d 212 (1974), *aff'd*, 394 Mich. 625, 232 N.W.2d 187 (1975).[28] *See also United States v. United States Gypsum Co.*, —— U.S. ——, —— — ——, 98 S.Ct. 2864, 2872–2878, 57 L.Ed.2d 854 (1978).

## B. Duress-Necessity-Compulsion-Choice of Evils·

 In addition to giving an instruction that made the evidence of conditions in the jail, assaults, and threats irrelevant to the intent issue, the trial judge refused to let the jury consider the evidence as grounds for a defense of "duress." There is some theoretical confusion over the nature of the defenses of duress and necessity, especially in the context of prison escape cases.[29] This confusion can be minimized,

---

**25.** *See, e. g., United States v. Grayson*, 550 F.2d 103 (3d Cir. 1977), *cert. granted*, 434 U.S. 816, 98 S.Ct. 53, 54 L.Ed.2d 71 (1977); *United States v. Cluck*, 542 F.2d 728 (8th Cir.), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 597 (1976); *Syck v. State*, 130 Ga.App. 50, 202 S.E.2d 464 (1973).

**26.** *See, e. g., State v. Green, supra* note 24, 470 S.W.2d at 568 (Seiler, J., dissenting); *People v. Whipple, supra* note 24.

**27.** *See People v. Unger, supra* note 11, 66 Ill.2d at 341, 5 Ill.Dec. at 852, 362 N.E.2d at 323. This court recently affirmed its confidence in the role of the jury as fact-finder in criminal cases in *United States v. Sheppard, supra* note 21. *Sheppard* discontinued the corroboration requirement in rape cases, relying on the adversary process and proper judicial instructions to guide the jury in reaching a just result. *See* note 21 *supra.*

**28.** Despite the length of the dissent, its basic differences from the opinion of the court can be stated briefly. The fundamental *theoretical* difference is that the dissent refuses to accept the holding of the *Nix* court that an "escape" requires an "intent to avoid confinement." *See* note 17 and text and notes at notes 11–14 *supra.* The dissent's motive for rejecting the *Nix* holding is related to the basic *practical* differences between the two opinions: While the court and the dissent basically agree on what

issues are relevant to weighing evidence of prison conditions in escape cases—*e. g.*, the severity of conditions, the availability of alternatives to escape, the promptness and voluntariness of return to custody—the dissent would hold all such evidence irrelevant as a matter of law unless it is determined that *every one* of five specific prerequisites related to these issues is met. The court, on the other hand, holds that, at least when a defendant, as in this case, introduces substantial evidence of extreme conditions, the jury is not absolutely prohibited from considering such evidence merely because certain inflexible prerequisites are not satisfied. In the court's view, the factors represented by the prerequisites are the most significant considerations, but none of the prerequisites by itself is necessarily determinative. Once the defendant has presented a threshold amount of evidence, that evidence is to be considered by a properly instructed jury. *See People v. Unger, supra* note 11, 5 Ill.Dec. at 852, 362 N.E.2d at 323 (quoted in note 37 *infra* ).

**29.** Most of the arguments and evidence presented by appellants do not fit within the standard definition of a "duress" or "necessity" defense. The duress defense normally requires a defendant to establish that he engaged in criminal conduct only because he was compelled to do so by another person's unlawful

however, by concentrating on the basic principles underlying a proffered defense and avoiding unhelpful labels such as "duress" and "necessity."

■ The defenses usually raised under the duress/necessity labels reflect two different general principles of exculpation. One of these principles, exemplified by the notion of duress as compulsion, dictates that a person will not be held responsible for an offense he commits under threats or conditions that a person of ordinary firmness would have been unable to resist.[30] This principle, like the defenses of intoxication, insanity, and mistake, negates the intent or voluntariness elements of an offense.[31] Instructions with respect to this type of defense for the crime of escape are discussed above under "Intent" (I–A *supra*) and require no further consideration here.[32]

■ The other general principle reflected in the discussions of duress/necessi-

threat which caused him reasonably to believe that he must commit the crime to avoid imminent death or serious bodily harm to himself or a third person. *See* W. LaFave & A. Scott, *supra* note 11, at 374–381. Only appellant Cooley's claim that Walker and Bailey forced him to leave the jail fits this classic model comfortably. The standard necessity defense is available when "[t]he pressure of natural physical forces * * * confronts a person in an emergency with a choice of two evils" and when choosing the lesser of the two evils requires the person to violate the criminal law. *Id.* at 381, 382–388. Since appellants' evidence involves human threats and forces, rather than natural physical ones, it does not establish a classic necessity defense. Courts and commentators have recognized the difficulties created, particularly in prison escape cases, by exculpatory evidence falling in between the traditional duress and necessity defenses and have proposed various solutions. *See, e. g., United States v. Michelson, supra* note 17; *People v. Lovercamp, supra* note 24; *People v. Unger, supra* note 11; *People v. Luther, supra* note 11; *People v. Harmon, supra* note 11; Gardner, *The Defense of Necessity and the Right to Escape from Prison*, 49 So.Cal.L.Rev. 110 (1975); Comment, *Escape: The Defense of Duress and Necessity*, 6 San Fran.L.Rev. 430 (1972); Note, *Duress and the Prison Escape: A New Use for an Old Defense*, 45 So.Cal.L.Rev. 1062 (1972); Casenote, *People v. Harmon*, 53 Mich.App. 482, 220 N.W.2d 212 (1974), 43 U.Cin.L.Rev. 956 (1974); Annot., *supra* note 24.

**30.** *See* Model Penal Code § 2.09 (Proposed Official Draft 1962) *and* Commentary on § 2.09 (Tent.Draft No. 10 1960).

**31.** The Model Penal Code includes the defense based on this principle, along with the defenses of intoxication and mistake, in Article 2: General Principles of Liability. The Model Penal Code defense based on the choice of evils principle, on the other hand, is included in Article 3: General Principles of Justification.

The dissent claims that every version of the duress defense must also satisfy the principle of "social utility" embodied in the "choice of evils" defense. Dissent at note 92. However,

if, as the dissent suggests, duress can be a defense only where the harm to be avoided by committing an offense outweighs the harm caused by committing the offense, then any separate provision for a duress defense in a code that already contains a general choice-of-evils-type defense would be mere surplusage. Yet, as indicated above, the Model Penal Code contains *both* a general choice of evils defense and a duress defense.

**32.** Appellants requested the following instruction on "duress":

A defendant is not criminally responsible for the commission of the crime of willingly and voluntarily escaping from jail if he committed the act of escaping from incarceration as a result of coercion exerted on him.

Coercion which would excuse the commission of a criminal act must result from:

1) Threatening [*sic*] conduct sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm;

2) The conduct in fact caused such fear of death or serious bodily harm in the mind of the defendant;

3) The fear or duress was operating upon the mind of the defendant at the time of the alleged act; and

4) The defendant committed the act to avoid the threatened [*sic*] harm.

When evidence of coercion or duress is present, the Government must prove beyond a reasonable doubt that the defendant did not act under coercion. In other words, if you have a reasonable doubt whether or not the defendant acted under coercion as the court has defined it to you, your verdict must be not guilty.

R. 32A. This instruction might be interpreted as raising only the type of defense that would be covered under the instructions on intent set out above. On the other hand, given the theoretical confusion over the labels of duress and necessity and the principles underlying these defenses, appellants' proposed instruction might also be construed to raise a choice of evils defense. We therefore consider that type of defense as well.

ty defenses is one of justification by choice of the lesser evil—*i. e.*, that a person is not guilty of an offense if he committed it because he reasonably believed his action was necessary to avoid a harm more serious than that sought to be prevented by the statute defining the offense.[33] Rather than excusing a defendant's action because he lacked the intent society wishes to punish, this "choice of evils" defense affirmatively justifies the defendant's action: the defendant did the *right* thing, because "public policy favors the commission of a lesser harm (the commission of what would otherwise be a crime) when this would avoid a greater harm."[34] Courts and legislatures that have recognized this type of defense have often reflected the theoretical confu-

sion surrounding the duress/necessity labels more than the fundamental choice of evils principle by creating "fixed rules which depart somewhat from the rationale underlying the [general] rule."[35] The tendency of courts to structure duress/necessity defenses in terms of such fixed rules has been particularly pronounced in escape cases.[36] The more progressive codes and cases, however, have tended to reduce the theoretical and practical complexities of the choice of evils defense to a few general guidelines consistent with its basic rationale.[37]

 In regard to the choice-of-evils-type defense, this particular case in its present posture at most[38] presents the relatively narrow question whether a jury should be allowed to consider an otherwise sufficient-

---

**33.** *See, e. g.,* Ill.Rev.Stat., ch. 38, § 7–13 (1975); Model Penal Code § 3.02 (Proposed Official Draft 1962) *and* Commentary on § 3.02 at 5 (Tent.Draft No. 8 1958); W. LaFave & A. Scott, *supra* note 11, at 378–379, 381–383. Even statements of the general principle vary in such aspects as the degree of objectivity required. The Model Penal Code, for example, requires that the balance of harms *in fact* favor commission of the crime, regardless of the defendant's reasonable belief.

**34.** W. LaFave & A. Scott, *supra* note 11, at 378.

**35.** *Id.*

**36.** *See, e. g.,* cases cited in note 24 *supra.*

**37.** The Model Penal Code provision reads:
Section 3:02. Justification Generally: Choice of Evils.
(1) Conduct which the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable, provided that:
(a) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and
(b) neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and
(c) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.
(2) When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for his conduct, the justification afforded by this Section is unavailable in a prosecution for any offense for which reck-

lessness or negligence, as the case may be, suffices to establish culpability.
Model Penal Code § 3.02 (Proposed Official Draft 1962). The Illinois Code section relied on by the court in *People v. Unger, supra* note 11, provides:
Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct.
Ill.Rev.Stat., ch. 38, § 7–13 (1975). The *Unger* court rejected an attempt to impose the rigid *Lovercamp* conditions in prison escape cases with the following comment:
We agree with the State and with the court in *Lovercamp* that the above conditions are relevant factors to be used in assessing claims of necessity. We cannot say, however, that the existence of each condition is, as a matter of law, necessary to establish a meritorious necessity defense.
The preconditions set forth in *Lovercamp* are, in our view, matters which go to the weight and credibility of the defendant's testimony. The rule is well settled that a court will not weigh the evidence where the question is whether an instruction is justified. * * * The absence of one or more of the elements listed in *Lovercamp* would not necessarily mandate a finding that the defendant could not assert the defense of necessity. 362 N.E.2d at 323. *See also People v. Luther, supra* note 11; *People v. Harmon, supra* note 11.

**38.** *See* note 32 *supra.*

ly supported [39] choice of evils defense in the absence of *one* of the special prerequisites some courts have imposed upon such defenses in escape cases—the requirement that an escapee turn himself in to the authorities immediately after escaping.[40] After considering appellants' proposed "duress" instruction [41] and a memorandum on duress/necessity defenses in escape cases submitted by the Government,[42] the trial court announced that it had prepared an instruction on duress, but at the last moment decided that it could not give the instruction because, "[a]s the Court heard the evidence," the defendants had not turned themselves in or made adequate efforts to do so. Tr. 806–807.[43]

The most influential statement of the "return requirement" as a prerequisite to a choice-of-evils-type defense in escape cases is contained in the opinion of an intermedi-ate California appellate court in *People v. Lovercamp,* 43 Cal.App.3d 823, 118 Cal. Rptr. 110 (1974).[44] The *Lovercamp* court apparently imposed the requirement because it feared that without it a prisoner who satisfied the other conditions of the defense could "thereafter go his merry way relieved of any responsibility for his unseemly departure." 118 Cal.Rptr. at 115. Subsequent opinions, most notably the Ninth Circuit's discussion in *United States v. Michelson,* 559 F.2d 567 (9th Cir. 1977),[45] have developed this rudimentary rationale more rigorously. The *Michelson* court's analysis reveals that the return requirement is based on the critical assumption that escape is a "continuing" offense, *i. e.,* that one may commit the crime of escape, even if his original departure from custody was justified, by failing or refusing to *return* to custody once the justifying circum-

**39.** The dissent claims that appellants failed as a matter of law not only to satisfy the return requirement, but also to present sufficient evidence of the harm to be avoided to get to the jury. Dissent, 190 U.S.App.D.C. at ——, 585 F.2d at 1116–1118. The dissent's view on this point contradicts the opinion of the trial court, which was willing to submit a "duress" instruction except for appellants' failure to meet the return requirement. *See* note 43 *infra.* In our view the trial court's conclusion that the evidence on this point was sufficient to submit to the jury was clearly correct. The dissent's narrow insistence on threats of "immediate" harm as an absolute prerequisite for the choice of evils defense seems particularly inappropriate in escape cases, where a possibility for escape (especially nonviolent escape) is not likely to remain available until a substantial threat becomes "immediate" in the narrow sense urged by the dissent.

**40.** The "return requirement" has been described in various ways. In this case the trial court refused to allow appellants' duress instruction because "[t]he defendants did not turn themselves in." Tr. 807. Elsewhere in the proceedings the trial court suggested that "[h]ad these men notified the authorities or the public defender in an effort to surrender under conditions that might have been arranged by the public defender, then I would have permitted the duress and condition argument." Tr. 778. *People v. Lovercamp, supra* note 24, establishes the return requirement in the following terms:

[A] limited defense of necessity is available if the following conditions exist: * * *
\* \* \* \* \* \*

(5) The prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat. 118 Cal.Rptr. at 115.

**41.** *See* note 32 *supra* for text of appellants' proposed instruction.

**42.** R. 35.

**43.** The trial court expressly stated that if appellants had satisfied the return requirement, "I would have permitted the duress and condition argument. In fact, I have here an instruction, which I drew up very carefully with that in mind, but I realized that at the end of which I was calling upon the jury to make a finding that they couldn't make, that is to say that these men had turned themselves in and that is a prerequisite to the assertion of the defense of duress, or coercion." Tr. 778–779. Since the court's instruction would have been given but for the return requirement, the choice of evils issue in this case turns on the validity of that requirement.

**44.** The *Lovercamp* court's version of the return requirement is quoted in note 40 *supra.* Since the prisoners in *Lovercamp* had been apprehended almost immediately after their departure, the appeals court remanded the case for a determination of whether appellants *intended* to surrender to the authorities.

**45.** *See also Stewart v. United States,* 370 A.2d 1374 (D.C.Ct.App. 1977).

stance is no longer present. Thus the Ninth Circuit found it unnecessary to decide "whether defendant acted out of duress in escaping" because the defendant in *Michelson* had been absent from custody for nearly two years and his duress defense applied only to his initial departure, not to the two years he was at large.[46] 559 F.2d at 571. In support of its conclusion the *Michelson* court cited with approval *United States v. Chapman*, 455 F.2d 746 (5th Cir. 1972), where "*[t]he jury was instructed* that even if they should find that the defendant was initially forced by other prisoners to leave federal custody, 'if he thereafter on his own volition decided to remain at large this would constitute the crime of escape.'" 559 F.2d at 570–571, *quoting United States v. Chapman, supra,* 455 F.2d at 749 (emphasis added). Under the analysis in these cases, the return requirement merely stands for the limited and commonsense notion that a choice of evils defense to the crime of "escape"—defined as leaving *and staying away from* custody—lasts only as long as the choice of evils justifies a failure to return.

 The Ninth Circuit's analysis indicates that the trial court's application of the return requirement in the circumstances of this case was inappropriate.[47] Even if we accept the notion on which the requirement is based—that escape is a continuing offense—this theory was not reflected in the indictment or in the trial court's charge to the jury. Although we would be very sympathetic to a jury instruction similar to that in *Chapman* to the effect that a defendant can "escape" by failing to return to custody even if his initial departure was justified and that a choice of evils defense to escape must therefore justify not only a defendant's original departure but also his continued absence,[48] no such instruction was given in this case. Instead, appellants were indicted for "flee[ing] and escap[ing]" "[o]n or about August 26, 1976,"[49] and the trial court's instructions, rather than explaining a "continuing offense" concept to the jury, emphasized the notion that the offense took place when appellants left the jail on August 26.[50] Thus this is not a case where the jury was considering whether a defendant had escaped by failing to return. Appellants were tried and convicted of escaping by leaving the jail on August 26, and it was therefore error for the trial court to deny a choice of evils instruction on the ground that the defendants had not returned or adequately explained their continued absence. In effect, the trial court denied appellants' right to have the jury consider a duress defense to the crime with which they had been charged (escaping on August 26) because the *court* found that they would in any event be guilty of an offense *under a theory (failure to return)' that was never*

**46.** The prisoner in *Michelson* allegedly feared that if he remained in prison he would be harmed by another inmate who had already injured him in a violent fight. 559 F.2d at 568.

**47.** *Michelson* is also distinguishable from this case on the intent issue. The defense in that case did not raise the issue, and the court's comments on the circumstances of the case indicate the reason for this: "The F.B.I. agent who arrested Michelson testified that Michelson, having been advised of his rights, freely admitted escaping * * * [and] also told the agent that his escape had been prompted not only by his beating by Santini, but also by the lengthy twenty-two year sentence imposed for the bank robbery and the Parole Board's refusal to set a release date for him." 559 F.2d at 568.

**48.** We recognize the pressures that have led courts to construe escape as a continuing offense. *See* note 17 *supra.* Nevertheless, there is some force to appellants' argument that this interpretation is not clear on the face of the statute, and the rule favoring strict construction of criminal statutes makes it important that the continuing offense concept be clearly explained to the jury.

**49.** R. 32.

**50.** For example, the trial court instructed the jury to consider whether the defendants had been convicted of a felony "at the time of the offense charged in the indictment, that is to say August 26th, 1976 * * *." Tr. 801. The trial court's instructions when read as a whole clearly give the impression that appellants were being tried only for leaving the jail on August 26, and not for failing to return at some later date.

*presented either to appellants or to the jury.* We cannot sanction such an obvious violation of appellants' constitutional right to jury trial.

Under the circumstances of this case it is unnecessary for us to consider exhaustively the proper prerequisites to a choice of evils defense in escape cases.[51] The trial court apparently gave this question considerable attention, and we do not know the nature of its prepared instruction except that were it not for the return requirement, which must be modified in accordance with our opinion,[52] it was willing to have the jury consider the defense.[53]

### C. Summary

We find prejudicial error in the District Court's instruction on the element of "escape," which prevented the jury from properly considering evidence relevant to appellants' intent. The District Court also erred by imposing a return requirement as an absolute prerequisite to appellants' proposed "duress" instruction, rather than instructing the jury that escape is a continu-

ing offense and that such a defense must therefore justify a defendant's continued absence as well as his initial departure. Appellants' convictions must therefore be reversed and their cases remanded for a new trial.

### II

Appellants also challenge the trial court's instructions and the sufficiency of the evidence with regard to another element of the offense: whether at the time they escaped they were *in the custody of the Attorney General by virtue of the convictions alleged in the indictment.*[54] The indictment charged that all three appellants had been lawfully committed to the custody of the Attorney General by virtue of specific federal convictions and sentences and had escaped from such custody.[55] The prosecution's evidence indicated that Cooley was serving a sentence in the D.C. Jail, while Bailey and Walker, who were serving sentences in the federal facility in Leavenworth, Kansas, had been brought to the

---

51. *See United States v. Michelson, supra* note 17, 559 F.2d at 571 n.10.

52. An acceptable version of the "return requirement" would include (1) an instruction that escape is a continuing offense, and (2) an instruction that a choice of evils defense cannot justify continued absence if the conditions establishing the defense (whatever the court determines them to be) do not continue for the period a prisoner remains at large.

53. The dissent argues that the court "labor[s] mightily to exculpate these defendants." Dissent, 190 U.S.App.D.C. at ——, 585 F.2d at 1128. This statement wholly misconceives the issues in the court's opinion. We do not even decide whether the conditions alleged by appellants actually existed, much less whether they justified appellants' actions. Our concern is rather to clarify the law as to the relevance of appellants' evidence and to assure that the jury is not denied the opportunity to perform its accustomed and constitutionally mandated functions. Indeed, it is the *dissent* that "labors mightily" to usurp the jury's proper function when, for example, it rehearses its view of the evidence at length with the thinly veiled purpose of suggesting which witnesses are credible and which are not, dissent, 190 U.S.App.D.C. at ——, 585 F.2d at 1106–1108, and when it complains that requiring the jury (and the defendants) to be adequately informed of the

nature of the crime for which they are trying a defendant is "patently frivolous." Dissent, 190 U.S.App.D.C. at ——, 585 F.2d at 1116.

54. The reason for a defendant's confinement is important because of the penalty provisions of § 751(a), which vary the severity of the penalties depending on whether a defendant was in custody "by virtue of an arrest on a charge of felony, or conviction of any offense," or "for extradition or by virtue of an arrest or charge of or for a misdemeanor, and prior to conviction * * *." 18 U.S.C. § 751(a) (for full text *see* note 1 *supra*).

55. The charge against appellant Bailey is illustrative:

> On or about August 26, 1976, within the District of Columbia, CLIFFORD BAILEY, having been lawfully committed to the custody of the Attorney General on March 6, 1973 and April 18, 1973, by virtue of a conviction and sentence imposed by the United States District Court for the District of Maryland in Criminal Case Numbers 72–0599 and 73–077, respectively, did unlawfully and wilfully flee and escape from such custody.
>
> (Violation of Title 18, U.S.Code, Section 751(a))

R. 32.

D.C. Jail pursuant to writs of *habeas corpus ad testificandum* issued by the Superior Court for the District of Columbia.

Appellants raise two objections to the instructions and the evidence on the custody element of the offense. First, appellant Cooley argues that the prosecution's evidence that he was in custody by virtue of his federal conviction at the time he escaped was insufficient as a matter of law. The prosecution relied primarily on documentary evidence to prove the custody element in all three cases.[56] In Cooley's case, for example, the Government introduced (1) a "face sheet" showing that Cooley was committed to the "D.C. Jail" on April 10, 1976 as a "federal prisoner" (Government Exhibit No. 8), (2) a Judgment and Commitment Order dated May 20, 1976 showing that following his conviction of Possession of an Unregistered Firearm, 26 U.S.C. § 5861(d) (1970), Cooley was sentenced and "committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of five (5) years" (Government Exhibit No. 2), (3) an Escape and Apprehension Form dated August 26, 1976 noting that Cooley had escaped from the D.C. Jail on that date (Government Exhibit No. 5), and (4) the testimony of the Supervisor of Records at the D.C. Jail that there was no record of Cooley's being released from the jail's custody before August 26. Tr. at 27–28.

Since there was no specific documentary evidence, such as a return on the Judgment and Commitment Order, showing that the Attorney General committed him to the new D.C. Jail, Cooley argues that the evidence fails to prove that he was confined in the jail by virtue of the conviction alleged in the indictment. He draws support from *Strickland v. United States,* 339 F.2d 866 (10th Cir. 1965), a case in which the Tenth Circuit reversed a jury conviction under Section 751(a) because it held that evidence similar to that introduced here was insufficient as a matter of law to establish a *prima facie* case. Although the Government's proof of a "chain of custody" pursuant to the convictions alleged in the indictment is not as strong as it could be, we do not agree that the prosecution's evidence fails to establish a *prima facie* case as a matter of law.[57] Reasonable inferences based on the evidence presented could enable a jury to find beyond a reasonable doubt that appellant Cooley was in custody by virtue of the convictions alleged in the indictment at the time he left confinement. Moreover, the trial court's instructions with respect to Cooley's custody were essentially correct.[58]

The second objection related to the custody element of the offense concerns only the appellants who were brought to the D.C. Jail pursuant to writs of *habeas corpus ad testificandum*—Bailey and Walker. The trial court instructed the jury:

---

**56.** Appellants Bailey and Walker adopt appellant Cooley's argument with respect to their own cases. Although the documentary evidence varied slightly among the three cases, the analysis of Cooley's argument applies with equal force to the other two cases.

**57.** The court in *Strickland v. United States,* 339 F.2d 866 (10th Cir. 1965), relied on *Mullican v. United States,* 252 F.2d 398 (5th Cir. 1958), a case in which certain documentary evidence linking a defendant's custody when he escaped to the conviction alleged in his indictment was held inadmissible. Although the *Mullican* court found that the admission of the evidence had been prejudicial error, it did not dismiss the case (as the *Strickland* court did), but remanded for a new trial in which the jury would be allowed to decide the custody issue without the inadmissible evidence. 252 F.2d at 405.

**58.** The trial court instructed the jury that in order to convict it must find beyond a reasonable doubt (1) that each appellant had been convicted of a felony, and (2) that "as a result of the conviction [each appellant] was committed to the custody of the Attorney General or [his] designated representative, and was in custody at the time of the offense." Tr. 801–802. These instructions raise no problem, and we think it unlikely that the jury was confused by the court's earlier statement that "with respect to each of the defendants who is on trial in this case the Court instructs you that defendants convicted either in this federal court or in the Superior Court of felonies, or in the federal court[s] throughout the country are committed to the custody of the Attorney General of the United States. This is a general practice and the Court will take judicial notice of it and instruct you accordingly." Tr. 800.

Prisoners, such as two of the prisoners in this case, defendants in this case who are convicted in another jurisdiction and who were in the custody of the Attorney General, were brought to this jurisdiction as the documentary evidence shows, because they were summonsed [*sic*] as witnesses by another defendant in a proceeding then pending in the District of Columbia court. They are still under the custody today of the Attorney General regardless of how they happened to be brought into the District of Columbia Jail.

Tr. 800–801. Appellants claim that this instruction does not state the law and that it effectively removes an issue of fact from the jury's consideration.

Appellants' basic argument is that when a prisoner who has been committed to the custody of the Attorney General is transferred pursuant to a writ of *habeas corpus ad testificandum*, the prisoner is no longer in the custody of the Attorney General pursuant to the original commitment, but is in the custody of the court that issued the writ—at least during the operation of the writ. Appellants therefore urge that, contrary to the instructions given by the trial court, there was a factual question whether they were in the custody of the Attorney General or of the Superior Court at the time they left the jail, and they claim further that the Government's evidence on this factual issue was insufficient to establish a *prima facie* case.

Appellants claim to find authority for their position in the early Supreme Court opinion in *Barth v. Clise*, 79 U.S. (12 Wall.) 400, 20 L.Ed. 393 (1870). That case was a suit against a sheriff to recover a debt owed to the plaintiff by a prisoner who had escaped while the sheriff was allegedly responsible for his safekeeping. The sheriff, who had arrested the prisoner pursuant to a writ of *ne exeat* obtained by the plaintiff, had brought the prisoner into court pursuant to a writ of *habeas corpus* obtained by the prisoner. The prisoner then escaped from the courtroom during the *habeas corpus* proceeding and fled to Canada. The Supreme Court held that the sheriff was not liable for the debt owed by the prisoner, explaining that once the sheriff had returned the prisoner to the court pursuant to the writ of *habeas corpus*, the responsibility for the safekeeping of the prisoner passed to the court "until the case is finally disposed of." 79 U.S. (12 Wall.) at 402, 20 L.Ed. 393.

Citing broad language in *Barth*,[59] appellants argue that unless the testimony for which they had been brought to the District of Columbia had been completed, they were in custody pursuant to an order of the Superior Court and not by virtue of their federal convictions at the time they left the jail.[60] Similar arguments based on *Barth v. Clise* have been raised in several previous escape cases brought under Section 751(a), but such arguments have never persuaded any court to find the requisite custody lacking in the case before it.[61]

Like these other cases, the case before us is distinguishable from *Barth* on several grounds. *Barth* dealt with the common law

---

**59.** By the common law, upon the return of a writ of *habeas corpus* and the production of the body of the party suing it out, the authority under which the original commitment took place is superseded. After that time, and until the case is finally disposed of, the safe-keeping of the prisoner is entirely under the control and direction of the court to which the return is made. The prisoner is detained, not under the original commitment, but under the authority of the writ of *habeas corpus*. Pending the hearing he may be bailed *de die in diem*, or be remanded to the jail whence he came, or be committed to any other suitable place of confinement under the control of the court. * * *

*Barth v. Clise*, 79 U.S. (12 Wall.) 400, 402, 20 L.Ed. 393 (1879).

**60.** The prosecution introduced no evidence at the trial as to whether appellants had completed their testimony in the Superior Court. Appellants Walker and Bailey therefore argue that their cases must be dismissed.

**61.** *See, e. g., United States v. Viger,* 530 F.2d 846 (9th Cir. 1976); *United States v. Stead,* 528 F.2d 257 (8th Cir. 1975), *cert. denied,* 425 U.S. 953, 96 S.Ct. 1730, 48 L.Ed.2d 197 (1976); *Tucker v. United States,* 251 F.2d 794 (9th Cir. 1958).

liability of a custodian for the escape of a prisoner, while this case involves an interpretation of the terms of the federal escape statute. The prisoner in *Barth* escaped from the courtroom during the *habeas* proceeding, while appellants allegedly left an institution designated by the Attorney General for confinement of federal prisoners. Finally, *Barth* involved a writ of *habeas corpus ad subjiciendum* (the Great Writ), while the case before us concerns a writ of *habeas corpus ad testificandum*.

In light of these distinctions, we find that *Barth* does not prevent us from deciding that a prisoner who has been committed to the custody of the Attorney General by virtue of a conviction is still in the custody of the Attorney General by virtue of that conviction for the purposes of Section 751(a) when he is transferred pursuant to a writ of *habeas corpus ad testificandum* and confined in an institution designated by the Attorney General for the custody of federal prisoners. Policy considerations support at least this broad an interpretation of Section 751. The jurisdiction from which a prisoner is brought pursuant to a writ of *habeas corpus* has a significant interest in preventing the prisoner's escape from custody. This interest has been recognized in an analogous situation by the drafters of the Interstate Agreement on Detainers (IAD), who provided that when a prisoner serving a sentence in one jurisdiction is brought to another jurisdiction for trial on another offense and escapes while in the receiving jurisdiction, he may be prosecuted under the escape statute of the sending jurisdiction.[62]

In addition to protecting the interest of the sending jurisdiction, holding that prisoners transferred by writs of *habeas corpus ad testificandum* are still in custody "by virtue of" the original commitment makes intuitive sense. The writ of *habeas corpus ad testificandum* is necessary only because the prisoner is already in custody elsewhere; the prisoner is kept confined when he is not testifying essentially because of the previous commitment; and any time during which the prisoner is confined under the writ counts toward satisfying the prisoner's original sentence. Courts interpreting the term "custody" in escape cases [63] and cases involving writs of *habeas corpus* [64] have demonstrated a flexibility responsive to such considerations of policy and common sense. Indeed, at least two other judicial decisions have in effect come to the same conclusion we reach.[65]

Although the trial judge's instructions matched the general sense of our holding, we recognize that some portions of the instructions on this matter were confusing and might have invaded the province of the jury.[66] We assume, however, that any such deficiencies in the instructions will be cured on remand.

---

**62.** (g) For all purposes other than that for which temporary custody as provided in this agreement is exercised, the prisoner shall be deemed to remain in the custody of and subject to the jurisdiction of the sending State and any escape from temporary custody may be dealt with in the same manner as an escape from the original place of imprisonment or in any other manner permitted by law.

Interstate Agreement on Detainers, Article V(g), 18 U.S.C.App. (1976).

**63.** *See, e. g., United States v. Rudinsky*, 439 F.2d 1074 (6th Cir. 1971) (prisoner on work release); *Chandler v. United States, supra* note 13, 378 F.2d at 908; *Read v. United States*, 361 F.2d 830 (10th Cir. 1966) (prisoner at recreation away from institution); *Frazier v. United States*, 119 U.S.App.D.C. 246, 339 F.2d 745 (1964) (prisoner in hospital outside institution).

**64.** *See, e. g., Hensley v. Municipal Court*, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973); *Peyton v. Rowe*, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968); *Jones v. Cunningham*, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).

**65.** *United States v. Viger, supra* note 61; *Tucker v. United States, supra* note 61. *See also United States v. Hall*, 451 F.2d 347 (4th Cir. 1971).

**66.** An example is the court's instruction that prisoners such as appellants Bailey and Walker "are still under the custody today of the Attorney General regardless of how they happened to be brought into the District of Columbia Jail." Tr. 800–801.

## III

Appellants also raise other issues,[67] but in light of our decision to grant a new trial on the ground of the erroneous instructions on "escape" we find it unnecessary to discuss these other questions.[68] These cases are accordingly reversed and remanded to the District Court for further action consistent with this opinion.

*Reversed and remanded.*

WILKEY, Circuit Judge, dissenting:

Traditionally, claims of compulsion have been governed by strict standards; defendants have been required to raise such issues within the framework of the affirmative defenses of duress and necessity, and these defenses have been precisely defined, carefully hedged, and subject to strict proof. In a radical departure from this approach, the majority holds that even if evidence is insufficient as a matter of law to make out a duress or necessity defense, it must nevertheless be presented to the jury as bearing, in some nebulous and undefined way, on a defendant's "voluntariness" and "intent".

Although my colleagues do not seem to realize it, this bouleversement effectively abolishes the defenses of duress and necessity, and the salutary standards embodied in them. In their stead it places vague, expanded, and essentially deterministic concepts of "intent" and "voluntariness," whose just application, no matter how well-intentioned, is obviously fraught with difficulties. I respectfully dissent.

## I. THE FACTS

In the early morning hours of 26 August 1976, officers of the District of Columbia Detention Facility discovered that an escape had been effected through a low-level window in the Northeast-1 housing unit. A check of the unit revealed that three prisoners—Bailey, Cooley, and Walker—were among those escaped. Bailey, serving a sentence of 23 years at the time, had been convicted in 1973 of bank robbery and attempted escape. Walker, serving a 15-year sentence, had been convicted in 1973 of bank robbery. Cooley, doing 5 years, had been convicted in May 1976 of possession of an unregistered firearm.

---

**67.** Despite its length, the dissent addresses only one of the issues raised by appellants. As the court's opinion indicates, appellants raise several other substantial issues, some of which were unnecessary for the court to reach because the case is being reversed and remanded on the issue the dissent does address. Since the dissent would affirm rather than reverse, it would apparently decide all these other issues against appellants, but the dissent's failure to concur in part or even to mention any of the other issues in these cases is curious.

**68.** Some comments on a few of these other issues may be useful. Appellants Bailey and Walker seek to have their cases severed from that of appellant Cooley because of alleged prejudice from inconsistent and conflicting defenses (Bailey and Walker assert that they were forced to leave by conditions in the jail, while Cooley claims that, in addition to conditions in the jail, Bailey and Walker forced him to leave). The trial court denied a pretrial motion to sever based on prejudicial joinder under Rule 14, Fed.R.Crim.P., and refused to change its ruling after the evidence had been presented. For the first time on appeal appellants raise the further argument that joinder of all three cases in the indictment was improper under Rule 8(b), Fed.R.Crim.P. The Government responds that any Rule 8(b) objection was waived because it was not raised before trial. It claims that the Rule 14 motion made before trial cannot serve as a substitute for a Rule 8(b) objection. On remand appellants will be given a chance to raise their Rule 8(b) objection in timely fashion, and the trial court will have the benefit of knowing the precise nature of the alleged inconsistency of defenses if and when it again considers the issue of prejudicial joinder.

Appellant Bailey also argues that he was prejudiced by the introduction of evidence of a prior conviction of escape. This conviction was one for which he was allegedly in custody when he escaped, but Bailey claims that the prosecution could have relied solely on another conviction—of robbery—for which he was also allegedly in custody, and thus could have avoided the prejudicial impact of the prior escape conviction. Since the statute requires that the escapee must have been in custody by virtue of a conviction, evidence of any conviction for which a defendant is in custody when he escapes is directly relevant as long as this element is disputed. In the case on which appellant Bailey relies, *United States v. Spletzer, supra* note 17, the defendant had *stipulated* to the conviction and confinement elements of the offense. This course is also open to appellant Bailey on remand.

Cooley, Bailey, and Walker were later apprehended in the District of Columbia by FBI agents on 27 September, 19 November, and 13 December 1976, respectively. On 23 November 1976 all three were indicted for escape from custody, a violation of 18 U.S.C. § 751(a), and prison breach, a violation of 22 D.C.Code, § 2601. On 8 March 1977 a jury trial commenced in the United States District Court for the District of Columbia before District Judge Oliver Gasch.

## A. The Evidence

During trial the defendants did not dispute that they had escaped from jail, but they offered a great deal of evidence to establish their contention that the escape was justified in view of the desperate conditions there. Several witnesses were produced who had been incarcerated with defendants. Their testimony was offered to establish that frequent fires, assaultive and threatening conduct by corrections officers, and lack of adequate medical attention combined to make conditions so unbearable that defendants were compelled to flee for their own well-being. The basic issue on this appeal is whether or not, and in what manner, the jury should have been instructed to consider this evidence.

### 1. The Fires

Several prison inmates incarcerated with defendants in the Northeast-1 unit testified that fires were frequently set there. One inmate said that they occurred every day.[1] Estimates varied on how long the fires were allowed to burn. One prisoner thought they lasted for an hour,[2] while another testified that they lasted for an hour and a half and that the smoke remained all night.[3] The same prisoner said that the guards "just let them burn until they burn out".[4] However, there was no evidence of a fire on 26 August 1976, the day of the escape.

The Assistant Administrator of Operations at the facility, called to the stand by defendant Walker, contradicted these allegations. While he acknowledged that there had been small fires set in Northeast-1, he said that the inmates themselves had set the fires[5] and that the officers on duty had promptly extinguished them.[6] After the fires had been put out, exhaust fans were turned on to clear the smoke from the air, and medical attention was provided for anyone found to be in need of it.[7] A corrections officer who had been stationed in Northeast-1 in the summer of 1976 recalled that fires were set in the unit every week, but that they lasted only five to seven minutes.[8] He testified that, to his knowledge, no officer had ever permitted a fire to burn without acting to extinguish it.[9]

### 2. Abusive Conduct by Guards

Testimony was also elicited that beatings were frequently administered to the inmates by corrections officers stationed in Northeast-1. One inmate claimed that they took place on a daily basis.[10] Another inmate reported seeing a group of six or seven guards attack defendant Bailey with blackjacks and mace.[11] This incident occurred, according to the inmate, more than three weeks before Bailey's escape.[12] The inmate also claimed that he had seen a guard hit defendant Cooley in the face with a blackjack.[13] He said that this conduct also occurred in early August 1976.[14]

1. Tr. 150.

2. Tr. 377.

3. Tr. 390.

4. Tr. 378.

5. Tr. 203; 206.

6. Tr. 209.

7. Tr. 236.

8. Tr. 354.

9. Tr. 363.

10. Tr. 155.

11. Tr. 368.

12. Tr. 380.

13. Tr. 373–374.

14. Tr. 382.

Threats by the guards were also the subject of a good deal of testimony. A prisoner testified that in August he had received a beating by one of the guards who then told him to deliver a message to defendant Bailey to the effect that the guards were going to kill him and beat him for testifying in a particular court case.[15]

Once again the Assistant Administrator of Operations told a different story:

[W]e have not found any instance where either one of these young men were attacked by anyone. It has been the other way around in most cases.[16]

He acknowledged that he had received reports of situations requiring the use of physical restraint by officers in the section. He described one incident in which "Mr. Bailey came back into the housing unit and made an unprovoked attack on another resident . . . [and] two officers pulled Mr. Bailey off the man, restrained him."[17] A corrections officer testified that during the month of August there had been no beatings of inmates by any corrections officer.[18]

### 3. Lack of Medical Attention

The allegation that deprivation of required medical care led to dangerous conditions at the jail was advanced principally by appellant Walker. Seeking to establish that he had an epileptic condition requiring frequent medication which was not adequately supplied, the defense called Dr. Samuel Bullock, Chief Medical Officer at the New Jail. However, Dr. Bullock's testimony established only that medication for the control of epileptic seizures *had been prescribed* for Walker. It had been prescribed at the infirmary on a trial basis since the only information available on appellant's "condition" was that contained in the medical history provided by Walker himself.[19] When closely questioned about how often the medication had been received, Dr. Bullock said:

This is still a trial basis. We have no evidence that Mr. Walker had any—was even an epileptic.[20]

The doctor further testified that the time period for receipt of medication on a trial basis is set up by the prescribing doctor in each case, and that the medication was prescribed in Walker's case merely as a precautionary measure.[21]

Appellant Walker also called Dr. Aris Karas, staff psychiatrist at the United States Penitentiary in Leavenworth, Kansas. Dr. Karas had treated Walker at Leavenworth after he had complained of seizures coming in his sleep. Dr. Karas was very clear about whether epilepsy had actually been diagnosed in Mr. Walker's case:

I want to make, with Your Honor's permission, one point clear . . . I did not make a diagnosis of seizure disorder . . . [b]ecause nobody witnessed it from the staff or from the employees . . . It was only diagnosed convulsive disorder by history.[22]

### 4. Defendant's Testimony

Defendant Cooley testified that on the morning of the escape, the correctional officers on duty opened the door to his cell, allowing him to leave. Once outside the cell, he encountered Bailey and Walker, who allegedly forced him to escape by threatening to kill him:

[L]ike I was out of my cell. They said, "You be gone or we're going to kill you." I say, "Man, I ain't escaping." They say, "Man, you're out of your cell. We don't

15. Tr. 154.

16. Tr. 255.

17. Tr. 232.

18. Tr. 354.

19. Tr. 438–439.

20. Tr. 441.

21. Tr. 458–459.

22. Tr. 680–681.

trust you. You're going out." Just like that.[23]

*Later, however, Cooley testified that he left the jail by himself and that he did not know whether Bailey and Walker left at all.*[24] When asked if he had ever made an attempt after leaving prison to notify anyone in authority about the escape, he said that he did not know anyone to call.[25]

Defendant Bailey also testified about the circumstances leading up to his escape. As he was lying in bed in the early morning hours of 26 August, his door suddenly opened, and he then left the jail. When asked to supply the details of how he was able to leave, he claimed that he did not remember:

> I don't even remember. It seems like I just blacked out . . . I have been trying to figure it out. I admit I left that jail. There is no doubt about it. I swear to God I left there . . . all I can say is I just don't remember. I just blacked out that morning.[26]

Fortunately, Bailey's memory improved following luncheon recess when he was cross-examined by defendant Walker. After admitting that his prior testimony about blacking out was not truthful,[27] he went on to give the details of the escape. As he was walking down the unit hall, he discovered that the window in Walker's cell had been removed; he entered the cell and climbed down some bed sheets already hanging from the window. After escaping he made no effort to surrender himself to the authorities.[28]

Defendant Walker's testimony was quite brief. After complaining about conditions in the jail, he asserted that after his escape he had contacted the proper authorities. Specifically, he said that he "kept a constant rapport with the FBI"[29] but admitted that he never surrendered himself to their custody. Walker also denied seeing Cooley the day of the escape.

## B. *The Instructions*

At the close of the evidence the defendants requested the court to instruct the jury on the affirmative defense of duress—that is, to instruct the jury that it could find that the defendants had been compelled to escape by conditions at the jail and that such escape was justified. In a conference on the proposed instructions, however, the court ruled that the affirmative defense of duress was not available to defendants, since none of them had surrendered to authorities after their escape. The court said:

> Had these men notified the authorities or the public defender in an effort to surrender under conditions that might have been arranged by the public defender, then I would have permitted the duress and condition argument. In fact, I have here an instruction, which I drew up very carefully, with that in mind, but I realized that at the end of which I was calling upon the jury to make a finding that they couldn't make, that is to say that these men had turned themselves in, and that is a prerequisite to the assertion of the defense of duress or coercion. So, for that reason I decided that I had to assume the responsibility myself.[30]

The Court therefore rejected the defendants' proposed instruction and instructed the jury as follows:

> You are instructed as a matter of law that conditions at the District of Columbia Jail or the new detention center, no matter how burdensome or restrictive an individual inmate may find them to be, are not a defense to the charges in this case, nor justification for the commission of the offense of escape.

23. Tr. 406.

24. Tr. 424–425.

25. Tr. 408.

26. Tr. 550.

27. Tr. 559.

28. Tr. 563–564.

29. Tr. 710–711: This assertion of "constant rapport" was contradicted on rebuttal by the FBI special agent responsible for the case. (Tr. 730–732).

30. Tr. 778–779.

If a particular inmate or group of inmates feel that they have been treated unfairly, they may seek correction of those conditions in the court system, but they are not entitled to commit the offense of escape or seek to take the law into their hands.

Now, the court permitted the defendants to introduce this evidence and to seek to show that following their escape they turned themselves in, for if one, after escaping, has turned himself in, then the defense of coercion or duress may be brought to the attention of the jury *as a defense,* but only if a defendant turns himself in.

Now, there are recognized procedures for this to be done, and requisite protections insured by such action. As the court heard the evidence, that was not done in this case. *So the court felt that it was incumbent upon the court to assume responsibility for this aspect of the case, and to take it out of the case in effect. So, you are not to consider the defense of duress or coercion for the reasons stated. The defendants did not turn themselves in.*[31]

Thus, the judge did not foreclose jury consideration of this evidence altogether; he simply ruled out the duress defense.

In addition, defendant Bailey urged the court to instruct the jury that escape from custody was a "specific intent" crime, and that the Government was required to prove that defendants specifically intended to avoid confinement *permanently* at the time they escaped from jail.[32] The court rejected this proposed instruction and instead instructed the jury that a defendant "escapes" if he "without authorization did absent himself from his place of confinement" and that this offense was a "general intent crime".[33] The court further instructed the jury on the precise meaning of "general intent".[34]

## C. The Verdict

On 14 March 1977 the jury found each defendant guilty of escape from custody. Pursuant to the court's instructions, the alternate charge of prison breach was not considered by the jury after they reached a verdict on the escape count. Each defendant was sentenced to a term of five years in prison, to be served consecutively to any sentence already imposed. These appeals followed.

## II. THE ISSUES

The basic issue raised in these appeals is whether, and in what manner, the jury should have been instructed to consider defendants' evidence regarding fires, assaults by prison guards, and inadequate medical attention. The defendants contend that the jury should have been instructed on the affirmative defense of duress and permitted to consider the evidence in connection with that defense. However, the majority holds that, regardless of whether the evidence was sufficient as a matter of law to make out an affirmative defense of duress, it should have been submitted to the jury as relevant to the "intent" and "voluntariness" elements of the crime of escape.[35]

Thus, in order to determine whether the trail court erred in instructing the jury as it did, three questions must be addressed:

1. Was the evidence adduced by defendants sufficient to provide a basis for an instruction on the defense of duress?

2. Apart from the availability of the duress defense, should the evidence have been expressly submitted to the jury as bearing on the "voluntariness" of the defendants' actions?

3. Should the evidence have been expressly submitted to the jury as bearing on the "intent" element of the crime of escape?

---

**31.** Tr. 806–807 (emphasis added).

**32.** Tr. 773–774.

**33.** Tr. 802; 799.

**34.** Tr. 799–800.

**35.** Majority Opinion at ——, ——, —— of 190 U.S.App.D.C., at 1093, 1094, 1096 of 585 F.2d.

## III. THE DEFENDANTS' DURESS THEORY

Defendants argue that the trial court committed reversible error by rejecting the proffered instruction on the defense of duress and by refusing to permit the jury to consider, in connection with such a defense, the evidence regarding fires, assaults by prison guards, and inadequate medical care.

While it is generally true that a defendant is entitled to an instruction on his theory of the case when it is properly requested by counsel,[36] it is well settled that an instruction should not be given if it lacks evidentiary support.[37] In a case in which evidence has been presented in an attempt to raise an affirmative defense, the trial court has the duty of determining whether the issue is sufficiently supported by the evidence to place it before the jury.[38] When the evidence fails to establish the defense, there is no factual issue to be decided by the jury, and the instruction is properly refused by the trial court as a matter of law.[39]

The evidence here failed on at least two grounds, as a matter of law, to establish the defense. First, although the defendants offered much evidence describing conditions which allegedly compelled them to escape, it is clear that, by all previous standards, the requisite degree of compulsion was not shown. Second, the evidence failed to show that any of the defendants turned themselves in to authorities after escaping those conditions. The trial court made a specific finding that lack of evidence on this point placed the duress issue in such a factual posture that it could not properly be decided by the jury as a matter of law. It therefore refused to submit the defense to the jury.

After a consideration of the duress defense in general, I turn first to the requirement of a prompt return to custody, and then to the requirement of immediate overpowering compulsion to establish the duress defense. Not one, but both, requisites are undeniably missing in the case at bar.

### A. The Duress Defense in General

Where the evidence as to the acts performed by the defendant is largely undisputed—as the departure from the jail of each defendant here—there are essentially two kinds of defenses in the criminal law. One type of defense negatives guilt by cancelling out the existence of some required element of the crime—either the *actus reus* or the "intent" element. For example, mistake of fact, intoxication, and insanity are defenses designed to establish that the defendant did not have the "intent" element required for the crime charged.[40]

The second kind of defense operates on an entirely different principle. It does not negative any element of the crime but instead goes to show some circumstance of excuse or justification which is deemed a bar to the imposition of criminal liability; that is, it goes to the matter of criminal responsibility.

Traditionally, claims of duress, compulsion, and necessity are treated as defenses of the latter type.[41] Under the classic "duress" defense, a defendant will be excused from committing an otherwise criminal act if he was *compelled* to perform the act by the unlawful threats of another person. The defense has three elements. First, in order to excuse the commission of a criminal act, the coercion must be *present, imminent, and impending* and of such a nature as to induce a well-grounded apprehension of *death or serious bodily injury*. Second,

---

**36.** *Brooke v. United States,* 128 U.S.App.D.C. 19, 385 F.2d 279 (1967).

**37.** *E. g., United States v. Waskow,* 519 F.2d 1345 (8th Cir. 1975).

**38.** *See United States v. Glassel,* 488 F.2d 143 (9th Cir. 1973), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974); *United States v. Teeslink,* 421 F.2d 768 (9th Cir. 1970).

**39.** *United States v. Glassel, supra; United States v. Ramsey,* 374 F.2d 192 (2d Cir. 1967).

**40.** W. LaFave & A. Scott, Handbook on Criminal Law § 8 at 46–47 (1972) [hereinafter cited as LaFave & Scott].

**41.** *Id.* §§ 49, 50.

there must be no opportunity to avoid the threatened harm. And finally, the defense may never be raised to justify the taking of innocent life.[42]

The theoretical basis for the duress defense is excuse; though the act is considered wrongful, the actor is not held responsible because he has taken the best possible course of action in a situation in which his "free will" has been severely curtailed but not entirely eliminated. Thus, the rationale for the defense is not that the defendant, faced with the unnerving threat of harm unless he does an act which violates the literal language of the criminal law, somehow loses his mental capacity to commit the crime in question. Rather, it is that, *although a defendant has the mental state which the crime requires, his conduct which violates the literal language of the criminal law is excused or justified because he has thereby avoided a harm of greater magnitude.* Thus, the defense of duress rests on the social utility of a defendant's actions when faced with a choice of evils. For example, if A, armed with a gun, threatens B with immediate death unless B steals C's car, B is not guilty of larceny because it is better for society as a whole that B do the lesser harm (commit the larceny) than acquiesce in the greater harm (his own loss of life). On the other hand, if A threatens B with immediate death unless B *kills* C, B will *not be excused* of homicide if he kills C, since it is not necessarily better for society that B kill C than that A kill B.

The same considerations apply to the defense of necessity. The pressure of natural physical forces often confronts a person in an emergency with a choice between two evils: either the person may violate the literal terms of the criminal law and thus produce a harmful result, or he may comply

with those terms and thus produce a greater or equal amount of harm. For reasons of social policy, if the harm which will result from compliance with the law is greater than that which will result from violation of it, he is justified in violating it. Under such circumstances, he is said to have the defense of necessity.[43] The rationale of the necessity defense is not that the person, when faced with the pressure of circumstances of nature, lacks the mental state which the crime requires. Rather, it is that the public interest requires the selection of the lesser of two evils.

Necessity is usually distinguishable from duress because the emergency situation compelling a choice between evils is caused by forces of nature rather than coercion by other human beings. Some commentators have suggested that this is the only real difference between the defenses.[44] Others claim that there are further conceptual differences between the two. Whether or not they are actually distinct, they have been hopelessly commingled in case law.[45] The result has been the development of a hybrid defense—a "duress-necessity" defense—which retains the basic features of the duress defense, but which encompasses compulsion arising from natural forces in addition to coercion by other persons. For convenience, the term "duress defense" will be used hereafter in referring to both the classic duress defense and the hybrid duress-necessity defense.

## B. The Return to Custody Requirement in Escape Cases

In escape cases the duress defense has posed special problems for the courts. Recognizing that the defense carries within itself the germ of potential disorder even in ordinary cases, courts have been concerned

---

**42.** *E. g., Shannon v. United States,* 76 F.2d 490, 493 (10th Cir. 1935); LaFave & Scott § 49; Perkins, Criminal Law 951–54 (2d ed. 1964) [hereinafter cited as Perkins].

**43.** LaFave & Scott § 50; Perkins at 956–961.

**44.** LaFave & Scott § 50. *See* Note, Duress—Prisons and Prisoners—Duress is a Defense to a Prison Escape, 43 U.Cin.L.R. 956 (1974);

Note, Prisons—Escape—Necessity as a Defense, 37 Mo.L.R. 550 (1972).

**45.** *See* Gardner, The Defense of Necessity and the Right to Escape from Prison—A Step Towards Incarceration Free From Sexual Assault, 49 So.Cal.L.R. 110, 123 (1975) [hereinafter cited as Gardner].

that its casual application in escape cases could subvert prison discipline and endanger corrections personnel. Moreover, courts have recognized that, in escape cases more than in other types of cases, the defense is particularly susceptible to manipulation by the shrew and unscrupulous. There already exist among inmates powerful incentives to escape; the prison population is generally composed of recalcitrant individuals; the circumstances of prison life are such that at least a colorable, if not credible, claim of duress or necessity can be raised with respect to virtually every escape, and disproof of such claims can be quite difficult. Finally, in weighing the interests of the prison inmate against those of society as a whole, the courts have realized that society has an especially compelling interest in insisting that prisoners serve their full and uninterrupted sentences, since it is precisely upon the ineluctability of such punishment that the effectiveness of the penal system and, in turn, the safety of each citizen depends.

In view of these considerations, the duress defense has been more carefully hedged and subject to stricter proof in escape cases than in other types of cases. To prevent either before-the-fact fabrication by groups of inmates or after-the-fact construction to avoid punishment, the courts have set down strict standards which must be met before the defense is available.

The most comprehensive explication of these standards is provided in *People v. Lovercamp*,[46] an escape case in which the California Court of Appeals considered the availability of the duress defense. There, two defendants had been threatened repeatedly by a group of inmates who sought to force them to perform lesbian acts. When their complaints to the prison authorities elicited no response and they were again confronted by a threatening group that promised to return to gang rape them, they fled. They were immediately apprehended a few yards from the prison. When the defense of duress was raised at trial, the court refused to instruct the jury on it. In holding that the defense was available to the defendants, the Court of Appeals set forth five conditions that must be established before the defense could be submitted to the jury:

> . . . [W]e hold that the proper rule is that a limited defense of necessity is available if the following conditions exist: (1) The prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future;
>
> (2) There is no time for a complaint to the authorities or there exists a history of futile complaints which make any result from such complaints illusory;
>
> (3) There is no time or opportunity to resort to the courts;
>
> (4) There is no evidence of force or violence used towards prison personnel or other "innocent" persons in the escape; and
>
> (5) The prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat.[47]

The first of these requirements corresponds to the rule applicable to duress cases in general that the compulsion must be present, imminent and impending and of such a nature as to induce a well-grounded apprehension of immediate death or serious bodily injury. If the danger threatened is not *immediate*, the defense is not available.[48] The defense is reserved for back-to-the-wall situations. This requirement has been adopted by every court that has considered the availability of the defense in escape cases. Accordingly, the courts have uniformly agreed that prison conditions alone, no matter how intolerable and inhumane, do not justify or excuse escape.[49]

---

**46.** 43 Cal.App.3d 823, 118 Cal.Rptr. 110, 69 A.L.R.3d 668 (1974).

**47.** 118 Cal.Rptr. at 115 (footnotes omitted).

**48.** *E. g., State v. Green*, 470 S.W.2d 565 (Mo. 1971), *cert. denied*, 405 U.S. 1073, 92 S.Ct. 1491, 31 L.Ed.2d 806 (1972).

**49.** *E. g., Dempsey v. United States*, 283 F.2d 934 (5th Cir. 1960); *Grubb v. State*, 533 P.2d 988 (Okl.Crim.App.1975); *Hinkle v. Commonwealth*, 23 Ky.Law Rep. 1988, 66 S.W. 816 (1902).

The second and third requirements set forth in *Lovercamp* reflect the general rule that the defendant must have exhausted all reasonable means of avoiding the threatened harm. Thus, an escapee's claims of compulsion must be rejected if he could have avoided danger by resorting to administrative remedies within the prison, or by seeking judicial intervention. Once again, these requirements have been generally adopted by the courts.[50]

The fourth requirement enunciated in *Lovercamp* is a *stricter version* of the general rule that duress never excuses the taking of innocent life. The added strictures are a response to the fact that recognition of the defense in escape cases increases the risk of physical injury to corrections personnel as well as to other inmates. Most duress-escape cases that have reached the courts, however, have involved non-violent escapes, and, consequently, few courts have explicitly adopted this requirement, but it has been recognized by the Seventh Circuit.[51]

The fifth requirement of the duress defense set forth in *Lovercamp* is obviously of decisive significance in this case. It requires an escapee to report *immediately* to proper authorities once he has attained a position of safety. In the *Lovercamp* case itself the defendants had established all elements of the duress defense but this final "return" requirement; however, the court found the issue incapable of resolution since they had been apprehended immediately on their departure. Since the *Lovercamp* decision, this "return" requirement has found increasingly wide support among courts considering duress-escape cases, including 1977 decisions in the Ninth Circuit and the District of Columbia Court of Appeals.[52]

There are essentially two reasons for insisting on return as a condition precedent to accepting a defense of duress. The first is a policy reason. The "return" requirement is designed to mitigate some of the special problems attending application of the duress defense in escape cases. It is meant to narrow application of the defense to those who are in genuine fear of death or serious bodily harm because they otherwise have nothing to gain by escaping if they must surrender themselves immediately. In this regard the *Lovercamp* court observed:

> Thus, the defense becomes meaningless to one who would use it as an excuse to depart from lawful custody and thereafter go his merry way relieved of any responsibility for his unseemly departure. A prisoner cannot escape from a threat of death, homosexual attack or other significant bodily injury and live the rest of his life with an ironclad defense to an escape charge.[53]

The second, and most important, reason for conditioning the availability of the duress defense on an escapee's return to custody relates to the nature of the crime of escape itself. Under many statutes, escape has been held to be a "continuing" crime; that is, the offense is not complete when the escapee initially departs from custody but continues as long as he remains at large. Thus, under these statutes, even though a prisoner may have originally been justified in departing from custody, if he thereafter remains at large, his continued unexcused absence from custody constitutes the crime of escape. *Accordingly, if a defendant presents evidence justifying only his initial departure, such evidence would—*

---

**50.** *E. g., Dempsey v. United States*, 283 F.2d 934 (5th Cir. 1960); *People v. Hocquard*, 64 Mich.App. 331, 236 N.W.2d 72 (1975); *Matthews v. State*, 288 So.2d 712 (Miss.1974).

**51.** *United States v. Nix*, 501 F.2d 516, 519 (7th Cir. 1974).

**52.** *United States v. Michelson*, 559 F.2d 567 (9th Cir. 1977); *Stewart v. United States*, 370

A.2d 1374 (D.C.Ct.App.1977); *People v. Hocquard*, 64 Mich.App. 331, 236 N.W.2d 72 (1975); *State v. Worley*, 265 S.C. 551, 220 S.E.2d 242 (1975). *See People v. Wester*, 237 Cal.App.2d 232, 46 Cal.Rptr. 699 (1965); *State v. Palmer*, 6 Terry 308, 45 Del. 308, 72 A.2d 442 (1950).

**53.** 118 Cal.Rptr. at 115.

*as a matter of law—be an insufficient defense, since it would fail to excuse his subsequent continued absence.*

The federal escape statute, 18 U.S.C. § 751, *is unquestionably a statute of this type.* The courts of appeals have consistently held this to be so.[54] It is no surprise, then, that in the recent Ninth Circuit case of *United States v. Michelson,* the "return" requirement was expressly held to be a precondition to the availability of the duress defense in federal escape cases.[55]

In *Michelson,* the defendant-escapee was arrested and charged with escape two years after his unauthorized departure from a U.S. penitentiary in which he had been serving a 22-year sentence for armed robbery. At trial the defendant attempted to raise a duress defense, presenting evidence that he had had a violent fight with another inmate; that as a result of the fight, he was hospitalized for several days, while the other inmate was placed in solitary confinement; that the other inmate threatened to kill him; and that the defendant escaped the same day the other inmate was released from solitary confinement. The trial court refused to instruct the jury on the duress defense. Defendant challenged his conviction on the ground that the trial court erred in not granting the instruction. The Ninth Circuit affirmed the trial court, specifically holding that escape under 18 U.S.C. § 751 is a continuing offense and that an escapee must turn himself in to proper authorities as a prerequisite to the availability of the duress defense:

> Although duress may excuse the inmate's departure, it does not absolve his continued absence from custody. In other words, while coercion may shield the escapee from the imposition of additional punishment, it does not commute the sentence previously imposed. Thus, while the Court recognizes the availability of the duress defense to the crime of escape under proper circumstances, *the Court also recognizes that duress exonerates only the departure from custody, and not the continued absence.*
>
> *For this reason, an escape will not be excused by reason of duress if the escapee fails to submit to proper authorities immediately after attaining a position of safety. The inmate's failure to submit to proper authorities following the allegedly coerced escape amounts to an unexcused commission of the crime of escape. Therefore, when an escapee fails to submit to proper authorities, the asserted duress defense must be rejected because as a matter of law it does not negate the continued absence from custody.*
>
> Similarly, prior cases interpreting the escape statute, Section 751(a), have found that continued absence from custody constitutes the crime of escape.

. . . . . .

> In this case, we need not and do not decide whether defendant acted out of duress in escaping. His failure to report to the proper authorities during his nearly two years of freedom following his escape from McNeil Island Penitentiary precludes jury consideration of the asserted duress defense. Whatever the merits of the asserted duress defense, it did not license continued absence from custody.

. . . . .

> We conclude that the trial court did not err in refusing to give the requested duress instruction because of defendant's failure to submit to custody after attaining a position of safety.[56]

State courts considering the availability of the duress defense in escape cases have also deemed the *Lovercamp* requirements, including the "return" requirement, a cor-

---

**54.** *United States v. Michelson,* 559 F.2d 567 (9th Cir. 1977); *United States v. Spletzer,* 535 F.2d 950 (5th Cir. 1976); *United States v. Joiner,* 496 F.2d 1314 (5th Cir.), *cert. denied,* 419 U.S. 1002, 95 S.Ct. 321, 42 L.Ed.2d 278 (1974); *United States v. Chapman,* 455 F.2d 746 (5th Cir. 1972); *United States v. Coggins,* 398 F.2d 668 (4th Cir. 1968); *Chandler v. United States,* 378 F.2d 906 (9th Cir. 1967).

**55.** 559 F.2d at 570.

**56.** *Id.* at 570–71 (emphasis added).

rect statement of the law.[57] The *Lovercamp* standards have been termed "minimum conditions" which must be satisfied before the duress defense is available,[58] and it has been held that the defense may be considered by the trier of fact only "where there is a *prima facie* showing of evidence to support each and every one of the . . elements." [59]

In *Stewart v. United States*,[60] a District of Columbia case, the defense of duress was raised by an inmate of a halfway house who failed to return from the community at the required time and was prosecuted for escape under 22 D.C.Code § 2601. The defendant claimed that he had been abducted while returning to the halfway house and shot while fleeing his abductors. He feared to return to the house where he would be a "sitting duck" for his assailants. When he telephoned the halfway house, he was told to turn himself in, but he waited a month and a half before doing so. In affirming the trial court's ruling that such facts did not make out a valid defense, the District of Columbia Court of Appeals held that, when such a defense is raised

> the defendant must establish that he *immediately* returned to custody once the threat of harm was no longer imminent. A failure to surrender oneself after the threat has dissipated must be viewed as an escape accompanied by the intent to elude lawful custody. *See United States v. Chapman*, 455 F.2d 746 (5th Cir. 1972).
> . . . Even assuming that initially he acted out of fear of immediate death or serious bodily injury, the proffer failed to establish that the threat of injury remained imminent and that his fear of harm was reasonable during that time period, or that he immediately returned to custody once the alleged threat had dissipated.[61]

In the present case the trial court's ruling that the defense raised by defendants had not been established as a matter of law is amply supported by the record. No evidence whatsoever was adduced to show that defendants turned themselves in after they had escaped the danger they alleged existed. Defendants Bailey and Cooley admitted that they did not even attempt to call the authorities after escape, and though defendant Walker claimed a "constant rapport with the FBI," there was no evidence that he ever attempted to arrange surrender. In short, the defense evidence was completely lacking as to the essential "return" requirement, and the trial court properly excluded the matter from the jury's consideration.

Defendants argue that once a prisoner has escaped from danger, he should not be expected to return to the source of that danger and place himself again in harm's way. Presumably defendants believe that an escapee is entitled henceforth to go his merry way with a permanent and ironclad defense. This position completely ignores the rule that the duress defense is available only when there is *no reasonable alternative* to violation of the law. Once a prisoner escapes the immediate threat of death or serious bodily injury with which he was allegedly confronted in prison and is at large, he has open to him virtually an infinite variety of reasonable alternative means by which he can avoid these threats in the future without further violating the law by remaining at large. He can turn, for example, to the community, to public agencies, to public or private legal services, to politicians, to church groups or other private organizations that are in a position to take the action necessary to protect him from untoward danger once he returns to custody. The law imposes a duty on the escapee, once free, to pursue these legitimate means of redress, rather than to pursue self-help through continued criminality.

An escapee's generalized apprehensions that legal means of self-protection may not

---

57. See, e. g., stated cases cited at note 52, *supra*.

58. *State v. Worley*, 220 S.E.2d at 243.

59. *People v. Hocquard*, 236 N.W.2d at 75.

60. 370 A.2d 1374 (D.C.Ct.App.1977).

61. *Id.* at 1377 (emphasis added).

be as efficacious as illegal means do not excuse or justify his continued absence from custody. Each moment he remains at large he is actively breaking the law. To excuse or justify his continued absence on the basis of duress or compulsion, then, he must adduce some evidence that the dangers which originally impelled his escape remain imminent *and that there is no alternative means for him to protect himself from these dangers except by remaining at large.* Because of the various opportunities which fugitives have for redress, it is almost impossible to conceive of circumstances under which an escapee could make a showing that his continued absence was justified. Be that as it may, however, the fact is that defendants in the instant case have *not even attempted to justify their continued absence.* Under these circumstances, the duress defense is simply not available to them.

The majority acknowledges that the crime of escape under 18 U.S.C. § 751 is a "continuing" offense. It further acknowledges that this feature of the crime has given rise to the substantive rule of law that duress is available as a defense in escape cases only where an escapee has adduced evidence either (1) that he immediately surrendered to proper authorities upon attaining a position of safety from the immediate threat, or (2) that his continued absence from custody was justified because (a) the dangers that originally impelled his escape remained imminent *and* (b) there were no alternative means for him to protect himself from these dangers except by remaining at large. Having acknowledged these two points, the majority *cannot* logically avoid the conclusion—the inexorable conclusion—that defendants in this case were not entitled, as a matter of law, to a duress instruction.

In the first place, defendants *admit* that they did not return to custody; there is no factual dispute on this. In the second place,

defendants have adduced *no evidence whatever* justifying their continued absence from custody. It is fundamental that an instruction should not be given if it lacks evidentiary support; when evidence fails to establish the defense, there is no factual issue to be decided by the jury, and the instruction is properly refused by the trial court *as a matter of law.*[62] Clearly, the trial court in this case properly withheld the duress instruction.

The majority labors to avoid this conclusion by resorting to a patently frivolous argument concerning the scope of the indictment and instructions in this case. It dissects the crime of escape into two *separate and distinct* activities: first, unauthorized departure from custody, and, second, unauthorized continued absence from custody. It then treats these "separate" activities as "separate" offenses, contending that the defendants were not properly indicted for the distinct crime of continued absence from custody because the indictment refers to "flee[ing] and escap[ing]" "[o]n or about August 26, 1976" and that the trial court "emphasized the notion that the offense took place when [defendants] left the jail on August 26." Concluding that defendants "were being tried only for leaving the jail on August 26, and not for failing to return at some later date," the majority asserts that the trial court was precluded from relying on the continuing nature of the offense in refusing to grant a duress instruction.[63]

The fatal flaw in the majority's argument is that it treats the initial-departure aspect of escape and the continued-absence aspect of escape as two separate acts and two distinct offenses. They are not; they are necessary aspects of *one act—one single criminal transaction.* As the trial court instructed the jury in this case, escape consists in "absenting" oneself from custody. Obviously, in order to absent oneself from

**62.** *E. g., United States v. Waskow,* 519 F.2d 1345 (8th Cir. 1975); *United States v. Glassel,* 488 F.2d 143 (9th Cir. 1973), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974);

*United States v. Ramsey,* 374 F.2d 192 (2d Cir. 1967).

**63.** Maj. Op. —— of 190 U.S.App.D.C., 1100–1101 of 585 F.2d.

custody, one must depart from custody. Similarly, one cannot have "departed" from custody without having actually remained absent from custody for an appreciable period. The act of absenting oneself from custody necessarily entails not only the initial severance of control but also the maintenance of that status for an appreciable period of time, whether that be one minute or one hour or one year.

The fact that the trial court did not provide the jury with a full explication of the "continuing offense" aspect of the crime of escape is really without significance in this case and certainly is not relevant to the majority's argument. The majority's complaint is that the trial court precluded jury consideration of a duress defense and held as a matter of law that the defense was unavailable. However, the majority concedes that *if* the court had instructed the jury fully as to the "continuing offense" aspect of escape, then it could properly have held *as a matter of law* that the duress defense was unavailable and thereby have precluded jury consideration of the defense. Why should the result be different simply because in one case the trial court did not fully illuminate the "continuing offense" aspect of the offense for the jury and in the other case it did? *The jury is not making the decision on the availability of the defense in either case; the court is making the decision in both cases as a matter of law. The amount of information conveyed to the jury is therefore irrelevant to the propriety of the trial court's legal decision.*

The fact that the trial court in this case did not fully explain the "continuing offense" nature of escape had *only one* real practical effect. It deprived the jury of insights that would have made it *easier* to convict defendants. In fact, if the jury had been fully instructed on the continuing offense aspect of escape, it would have been *irrational* for it to have acquitted defendants, in light of the fact that defendants admitted remaining at large and failed to adduce any evidence to justify their continued absence. In other words, the trial courts' alleged omission was not only unprejudicial to defendants, but in fact affirmatively benefited them.

## C. The Immediate Compulsion Requirement in Escape Cases

The trial court was justified in refusing to instruct the jury on the duress defense *for still another reason.* The majority does not, and *cannot,* deny the validity of the traditional requirements that a duress defense must be predicated on threat of *immediate* death or serious bodily harm and a showing that there was no opportunity to avoid the threatened harm—in other words, that the defense is reserved for *back-to-the-wall* situations. The evidence presented by defendants plainly did not meet these requirements.

Cooley was the only one of the defendants who actually claimed that he had been *compelled* to escape by any form of *immediate* danger. However, even he later repudiated this claim and testified that he had indeed *not* been forced to leave the prison by Walker and Bailey. The conditions described by other defense witnesses could hardly be found to establish the seriousness, immediacy, and imminence of danger required to make out duress. Walker's complaint that he was not being adequately treated for self-diagnosed epilepsy, even though appropriate drugs *had* been prescribed; the defendants' general complaint that there had been, in the past, intermittent fires in the housing unit, even though there was no evidence that defendants' immediate safety had ever been endangered by these fires; and the defendants' general complaint that they had been subject to past "assaults" by prison guards, even though there was no evidence of an "assault" or even the utterance of a "threat" within approximately three weeks of the escape, simply do not present the back-to-the-wall situation necessary to make out a duress defense.

Similar, and even *more* compelling, complaints have been repeatedly rejected by the courts in scores of cases. Indeed, I invite the majority to cite *one* case, federal or state, in which claims of this type have been deemed sufficient to raise a duress defense.

The majority is unable to do so because the defendants' complaints clearly fall far short of the severe and immediate danger necessary to warrant a duress instruction. The trial court was plainly correct in refusing to instruct the jury on defendants' theory of the case.

## IV. THE MAJORITY'S "VOLUNTARINESS" THEORY

The majority suggests that, *regardless of whether the evidence presented by defendants was sufficient as a matter of law to make out an affirmative defense of duress,* it should have been submitted to the jury as relevant to the "voluntariness" of defendants' actions.[64] Finding that "voluntariness" is a necessary "element" of the crime of escape, the majority concludes that the trial court erred in precluding jury consideration of defendants' evidence of medical inattention, assaults, and fires.

The term "voluntary" is frequently used in two different ways in the criminal law.

In one sense, the term "voluntary" has been used as meaning "volitionally".[65] According to this usage, a "voluntary" act means only that an act is the product of the actor's will, *regardless of whether that will is freely exercised.* An act is "involuntary", then, where the actor's body is moved by overmastering physical force (*vis absoluta*) or where the actor's movements are a reflex or convulsion, or are performed during unconsciousness, sleep, or hypnosis. This type of "voluntariness", more properly called "volition", is treated under the rubric of *actus reus,* the physical element of crime. If a defendant's movements are not volitional, if they are involuntary, then they are not "acts" in the proper sense, and hence there is *no actus reus.* Thus, for example, if a prisoner has an epileptic fit during which he falls over the prison wall, or if he sleepwalks out the prison gate, or if he is carried out physically by other prisoners, then the *actus reus* of the crime of escape does not exist because the prisoner has not performed a volitional act. So, when the term "voluntary" is used as meaning "volitional", acts performed under duress are considered "voluntary" acts; even though they are not the products of the *free* will, they are nevertheless products of the will. Of course, the majority does *not* use the word "voluntary" in this sense.

The second way in which the term "voluntary" is used refers to exercise of the *free will,* rather than mere exercise of the will. In this context, an act is said to be "involuntary" where the will of an actor is subject to such coercive pressure (*vis compulsiva*) that it is overborne, and the actor —"against his own will"—*chooses* to violate the law rather than obey it. Thus, for example, if a prisoner is forced at gunpoint to walk out of prison "against his own will", then he has not acted "voluntarily". It is in this "free will" sense that the majority uses the term "voluntary," and it is in this sense that the term will be used in this section.

The majority is unquestionably correct when it says that "voluntariness"—free will—is a necessary element in the crime of escape, for it is a necessary element in *all* true crimes. It is a basic precept in Anglo-American law that the exercise of "free" will is essential to criminal responsibility. A person who has been deprived of "free" will and has been compelled to act against his will should not be held responsible and punished for his actions.

With respect to the present case, the majority's position is simply this: the defendants' evidence regarding fires, assaults, and medical care have some bearing on whether the defendants were exercising "free will" when they departed from prison; therefore, the evidence should have been submitted to

---

64. Majority Op. at —— of 190 U.S.App.D.C., at 1094 of 585 F.2d: "[A] jury can consider whether evidence of jail conditions, threats, and violence such as that presented by appellants in the District Court raises reasonable doubts concerning a defendant's capacity to act 'voluntarily,' or his intent to avoid confinement." (Emphasis supplied.) See also Maj. Op. at ——, —— of 190 U.S.App.D.C., at 1094, 1097 of 585 F.2d.

65. Perkins at 749; LaFave & Scott at 179.

the jury on the issue of "voluntariness", even though it did not make out a defense of duress.

This position is utterly untenable. It is black-letter law that, in cases such as this, *issues of "voluntariness" are to be raised through the affirmative defense of duress.* When a defendant asserts that he was deprived of free will and did not act "voluntarily" because he was compelled to violate the law either by force of circumstances or by the threats of other persons, then he must raise these matters within the framework of the duress defense. This is why I stated at the outset that my colleagues did not seem to realize the radical revolution they were writing into the law—a bouleversement that in reality abolishes the salutary standards that heretofore have governed the defenses of duress and necessity.

*The doctrine of duress has been fashioned precisely for dealing with the issue of free will.* As Professor Burdick writes in his treatise on criminal law:

> Since every crime requires a willing or voluntary mind, it may be a defense to a criminal charge that the criminal act was not committed voluntarily but was the result of coercion, compulsion, or necessity. As said by Lord Mansfield: "Whenever necessity forces a man to do an illegal act, [whatever] *forces* him to do it, justifies him, because no man can be guilty of a crime without the will and intention of the mind." Blackstone has also said: "A species of defect of will is that arising from compulsion and inevitable necessity. These are a constraint upon the will whereby a man is urged to do that which his judgment disapproves, and which it is to be presumed, his will (if left to itself) would reject. As punishments are therefore only inflicted for the abuse of that free will which God has given to man, it is highly just and equitable that a man should be excused for those acts which are done through unavoidable force and compulsion".

From the general statements of Lord Mansfield and Judge Blackstone quoted above, it might be presumed that compulsion or necessity is a valid defense in all cases, but the doctrine is hedged about with certain positive rules of law, and is recognized only in clear cases. In some instances it is not recognized at all.

. . .

> In order to excuse a criminal act on the ground of compulsion or necessity, one must have acted under apprehension of imminent and impending death, or of serious and immediate bodily harm.[66]

Other commentators observe:

> Legal responsibility, be it civil or criminal, implies freedom. To make a contract in law requires the free acts of the participants, and the doing of a socially reprehensible act is legally excusable, where the actor was not a free agent. We find, therefore, that where that most precious of all commodities, "free will," is stolen, the law has hastened to erect its doctrine of duress to mark the larceny.

> Criminal duress has, at its heart, the principle of freedom. The criminal law, wisely or not, has postulated for itself a world of free-will-ed agents and has fixed responsibility for action upon most classes of actors, except those who have "acted under compulsion."

> The merits of such an attitude are clear. If a person commits an act under compulsion, responsibility for the act cannot be ascribed to him since, in effect, it was not his own desire, or motivation, or will, which led to the act. Punishment of the actor would be misdirected and futile since it would deter neither him nor others, should it be the case that all were equally compelled to do acts outside of their own control. Thus, the law has reasoned that where it can be shown that a man acted under a compulsion which deprived him of his "free will," such an individual would not be held responsible for his act. This, in essence, is the thinking that lies behind the formulation of the criminal duress doctrine.

. . .

If "duress" was to excuse, it had to be shown that the compulsion was in its

---

**66.** 1 Burdick, Law of Crime §§ 198–199 at 260–262 (1946).

nature such as would induce a well grounded apprehension of death or serious bodily harm. The compulsion had to arise without the negligence or fault of the person claiming aid from the doctrine, and the compulsion had to be instant, present, imminent and impending. The force complained of by the victim must have lasted during the whole time required for the performance of the criminal act. The "duressed" had to show resistance to the point of death (or at least to the instant of serious and grievous bodily harm) before he capitulated and acted. The force had to be exerted, if not on the victim, then on someone close to the victim, such as a wife or child. The "duressed" had to avail himself of any opportunity to avoid or escape from the force. . . .

There was good reason for the profusion of standards. The doctrine held within it the germs of potential disorder. The business of excusing individuals from crimes which, in the last analysis, they had committed bodily, was a difficult and dangerous affair. Who could see or wisely guess at the presence of a will which freely motivated the body in that dreadful moment of criminal action? Inference, not observation, was the species of proof, and inferences, it was thought, required the aid of standards. If the doctrine was not to be the plaything of the shrewd and unscrupulous (and were not those suspected of crimes already questionable in that respect?) it had to be well hedged and strict of proof.[67]

Thus, the positive law that defines where free will ends and exculpating compulsion begins is embodied in the duress doctrine and *no where else.* The rule of law embodied in the doctrine is this: A defendant's actions are deemed voluntary, even though he has been subject to compulsion, unless the compulsion is such as to induce a well-grounded apprehension of immediate and avoidable death or serious bodily harm. If a defendant fails to adduce evidence of such duress, then as a matter of law he has acted voluntarily. Only when he· has adduced such evidence can there be a reasonable doubt as to his voluntariness. In short, the issue of duress *by definition* determines the issue of voluntariness: if legally sufficient duress exists, then the defendant may be acting involuntarily; if legally sufficient duress does not exist, then the defendant is deemed to be acting voluntarily as a matter of law.

My colleagues' effort to create an entirely new and separate exculpatory doctrine of "involuntariness" runs afoul of legal doctrine established for centuries and embodied in literally thousands of judicial decisions. In the instant case, the defendants failed to present evidence of legally sufficient duress, and consequently they must be deemed to have been acting voluntarily. It is clear, then, that the majority's holding that defendants' evidence should have been considered as bearing on defendants' "voluntariness," even though it may not have been sufficient to make out a duress defense, lacks all legal logic, since *the issue of voluntariness has already been determined through application of the duress doctrine.*

The practical effect of the majority's decision is to abolish the strict standards governing claims of "involuntariness" that were formerly embodied in the affirmative defense of duress and to replace them with a nebulous and essentially deterministic view of "voluntariness," or free will.[68] What really takes shape is a "totality of the circumstances" test similar to that used in Fourth and Fifth Amendment cases con-

---

67. Newman & Weitzer, Duress, Free Will and the Criminal Law, 30 So.Cal.L.R. 313, 313–14 (1957) (emphasis added).

68. I think this will be clear if we take a hypothetical situation and dispose of it first under traditional principles and then under the majority's approach.

Suppose that a particular prisoner leaves prison without permission. When ap- prehended the prisoner claims that he left prison because the food served in prison was unwholesome, and also because immediately before his flight he had been beaten up by a prison guard. How would this case be tried under traditional principles?

cerning voluntariness. Defendant would be able to adduce any and all evidence that may have some kind of bearing on his motivation. Evidence as to every conceivable unpleasantry that may exist in the prison may be thrown into the hodge-podge. Moreover, presumably evidence concerning motivation stemming from conditions external to the prison could be adduced by the defendant, i. e., that he was driven by a desire to see his dying mother. Confronted with this unstructured evidence the jury

The prosecution, of course, has the burden of production and the burden of persuasion with respect to every element of a criminal offense. Thus, in presenting his case in chief the prosecutor would be required to present evidence that the defendant had been in lawful custody and without permission had departed from that custody. There would be at least initially a presumption that the defendant intended the consequences of his actions and a presumption that he acted voluntarily. At this point, it would be up to the defendant to present a defense. A defendant has the burden of production concerning affirmative defenses and must start off matters by putting in some evidence in support of his defense. In federal court, once the defendant has introduced some evidence of the defense, he does not have the burden of persuasion regarding that defense. Rather, the prosecution must persuade the factfinder beyond a reasonable doubt that the defense does not exist. The defendant in this hypothetical situation could present one of two kinds of defenses. He could attempt to present evidence that would negate his state of mind, e. g., an intoxication defense, or he could present evidence that would negate his "voluntariness." In this hypothetical case, the defendant adopts the latter course; he produces evidence that the food in the prison was bad and that he had been beaten before his flight. At this point the court would rule that the evidence as to the quality of food in the prison was irrelevant because it did not tend to show any imminent threat of death or severe bodily injury confronting the defendant. Assuming the defendant is being tried under a non-continuing offense type statute, however, evidence as to the beating may be relevant to the defense of duress and therefore may be considered by the jury.

Once evidence has been introduced raising the issue of possible duress, the federal prosecutor has the burden of persuading the jury that there was not sufficient duress to warrant escape and he must do so beyond a reasonable doubt. However, the nature of his task is clearly defined by the elements of the defense itself. He must prove to the jury that there was no imminent threat of death or serious

would then be expected to find whether from all the circumstances there is any reasonable doubt as to whether the defendant acted voluntarily. This deterministic approach is a prescription for chaos and has wisely been rejected in the criminal law for hundreds of years.

## V. THE MAJORITY'S "INTENT" THEORY

The majority contends that the trial court did not properly instruct the jury on the

bodily injury and that whatever threat did exist could be remedied by resort to prison grievance procedures or to the courts. When the case is presented to the jury, the jury will be precisely instructed as to the significance of the evidence presented by the defendant. It will be told that it should find the defendant not guilty if it has a reasonable doubt as to whether the defendant's flight was prompted by compulsion or duress. The strict standards governing the duress defense will be laid before the jury in the instructions. The jury will be instructed that in order to constitute a defense, the duress must be present, imminent, and impending, and of such nature as to induce a well-grounded apprehension of death or serious bodily injury if the escape is not effected. If the jury has any reasonable doubt that the defendant left prison without such duress, then it must find the defendant not guilty.

Under the majority's approach, the task of the prosecutor and the jury will be much more difficult, if not impossible. Both the evidence concerning the quality of food and the evidence concerning the beating would be admitted into evidence. These circumstances would be said to have a bearing somehow on the defendant's "voluntariness." The prosecutor has the burden of proof of establishing each and every element of the crime beyond a reasonable doubt, and therefore, he must prove "voluntariness." But under the majority's approach how is he to challenge this evidence and reconfirm the defendant's voluntariness? And how is the jury to determine whether or not these items of evidence raise "reasonable doubt" as to the defendant's "voluntariness"? The prosecutor's task under the traditional approach was clearcut. All he had to do was disprove beyond a reasonable doubt the existence of certain specific elements. Moreover, the jury under the traditional approach was instructed precisely as to how it should assess evidence of duress. Under the majority's approach the jury is presumably instructed that evidence of duress somehow bears upon, or raises questions concerning, the defendant's voluntariness, but no standards are provided by which the jury can make this determination.

"intent" element required under 18 U.S.C. § 751 and that defendants' evidence regarding fires, assaults, and medical care was relevant to the "intent" element actually required by that statute. Therefore, it holds that the trial court erred in failing properly to submit the evidence to the jury on the issue of intent.[69] In order to determine whether the trial court acted properly in this respect, it is necessary to determine, first, the precise nature of the "intent" element required under 18 U.S.C. § 751, and, second, whether defendants' evidence was actually relevant to this element.

### A. Escape at Common Law

At common law the crime of escape is simply the unauthorized departure of a prisoner from legal custody before his lawful discharge.[70] According to Wharton:

> An escape is committed whenever by any unlawful means a criminal in lawful custody voluntarily leaves and gains his liberty before he is delivered in the due course of the law.[71]

The *actus reus* of the offense is the mere unauthorized physical departure from the place of confinement.[72] The *mens rea* of the crime is a general one. No special state of mind is required for guilt other than *the intent to go beyond permitted limits*.[73] The offense has been referred to as a "general intent" crime. In this context, intent means simply that the actor has the purpose of doing the very act he is performing, that

is, that he is not acting inadvertently or accidently, and that he is aware of the circumstances that make his act wrongful.

This "general intent" requirement can be illustrated as follows: If a prisoner *mistakenly* believes he has been authorized to leave prison and acts on this belief, he has not committed the crime of escape because he has not intended to leave the prison without authority. Similarly, if a prisoner is taking his evening constitutional in the prison exercise yard and, in the dark, *accidentally* walks out a prison gate, he has not formed the requisite intent for the offense. However, if a prisoner knows that he has no authority to leave prison and, *whatever his motivation*, still departs prison, *with the purpose of departing*, he has acted with the requisite intent. Thus, for example, if a prisoner leaves prison to visit his dying mother with the intent to return to prison, he has nevertheless "intended" to depart prison and he is therefore guilty of escape; it was still his purpose to avoid confinement, if only for a brief time. Similarly, if a prisoner is forced to leave prison at gunpoint, his "intent" is not negated.[74] *It was still his purpose to depart from custody; he may not have desired to leave, but he still intended to.*

This "general intent" requirement in escape cases has been variously expressed. It has been referred to as the "intent to go beyond permitted limits" [75] and "the intent

**69.** It is to be noted, however, that the trial court did not exclude defendants' evidence; the evidence was presented to the jury. Moreover, the court did instruct the jury that it "should consider *all the circumstances in evidence* that *you* deem relevant" to the intent issue. (Tr. 800). Thus, if the trial court did err—and I do not think it did—it was in failing to amplify for the jury the relevance of defendants' evidence to the intent element of escape. If anything, however, this "omission" was fortunate for defendants, since, as my discussion in this section demonstrates, defendants' evidence regarding fires, assaults, and medical inattention was *irrelevant* to the issue of intent.

**70.** 1 Burdick, Law of Crime 458–471. Technically, at early common law there were two related offenses—"escape" and "breach of prison." Escape was the unlawful departure of a

prisoner without an act of force. Breach of prison was departure through an act of force. The term "escape" now generally covers both offenses.

**71.** 3 Wharton's Criminal Law and Procedure § 1367 at 758 (1957).

**72.** Perkins at 502; 1 Burdick, Law of Crime 462–63.

**73.** Perkins at 502–03; 1 Burdick, Law of Crime 467; 3 Wharton's Criminal Law and Procedure 764.

**74.** LaFave & Scott §§ 49–50.

**75.** Perkins at 502.

to evade the due course of justice".[76] Wharton writes:

> The ordinary intent required to constitute the offense of escape . . . is the intent to do an act voluntarily which results in the unlawful liberation from lawful custody.[77]

Burdick writes:

> . . . [A] specific intent is not required, in the absence of any statutory provision to the contrary. The voluntary act of leaving lawful custody, without permission of law, is sufficient to constitute the general criminal intent required in all crimes.[78]

However expressed, this general intent requirement must be distinguished from the concept of "specific intent."

"Specific intent" requires a showing that the defendant had an *ultimate* purpose or motive in performing the wrongful act. An actor has specific intent if he has the design to accomplish some particular aim or object by engaging in criminal conduct.[79] If the crime of escape were a "specific intent" crime, rather than a "general intent" crime, a prisoner would not be guilty of escape unless it could be demonstrated that he had some *ultimate* purpose in mind *beyond* mere departure. Thus, for example, escape could conceivably be defined as a specific intent offense requiring an intent to avoid confinement *permanently.* In that case a prisoner would not be guilty of escape unless it could be proven that when he left prison he intended *never* to return. *The fact of the matter is, however, that escape at common law has never been deemed a specific intent crime; it has always been considered a general intent crime.*[80]

## B. *Escape Under 18 U.S.C. § 751*

The crime of escape is now largely governed by statute in the United States. The relevant federal statute is 18 U.S.C. § 751 which proscribes "escape from the custody of the Attorney General." The statute does not define the *actus reus* or *mens rea* of the crime beyond the words "escape from custody." The question therefore arises whether this statutory provision is essentially declar-

---

76. *People v. Weiseman,* 280 N.Y. 385, 21 N.E.2d 362 (1939).

77. 3 Wharton's Criminal Law and Procedure at § 764.

78. 1 Burdick, Law of Crime at § 467.

79. *United States v. Cullen,* 454 F.2d 386, 391–92 (7th Cir. 1971). *See* 1 Burdick, Law of Crime § 120; LaFave & Scott at 202; Dangel, Criminal Law, § 55 (1951); Perkins at 750–51, 762–64:

> Some crimes require a specified intention in addition to the intentional doing of the *actus reus* itself,—an intent specifically required for guilt of the particular offense, as in larceny, burglary, assault with intent to commit murder, using the mails with intent to defraud, or criminal attempt. The physical part of the crime of larceny, for example, is the trespassory taking and carrying away of the personal goods of another, but this may be done intentionally, deliberately, and with *full knowledge of all the facts and complete* understanding of the wrongfulness of the act, without constituting larceny. If this wilful misuse of another's property is done with the intention of returning it (with no change of mind in this regard) the special mens-rea requirement of larceny is lacking. Such a wrongdoer is answerable in a civil suit, and may be guilty of some statutory offense such as operating a motor vehicle without the consent of the owner, but for guilt of common-law larceny he must not only intentionally take the other's property by trespass and carry it away,—he must do this with an additional design in mind known as the *animus furandi* or intent to steal. Burglary, moreover, cannot be defined as "intentionally breaking and entering the dwelling of another in the nighttime," because this may be done without committing this felony. For common-law burglary there is required not only the intentional breaking and entering of the dwelling house of another in the nighttime, but also an additional purpose—which is to commit a felony (or petty larceny). This additional requirement is a "specific intent," an additional intent specifically required for guilt of the particular offense.

> *Id.* at 762 (footnotes omitted).

80. The majority relies heavily on the authority of Model Penal Code drafts. Maj. Op. at —— —— of 190 U.S.App.D.C., at 1097–1098 of 585 F.2d. It is significant, then, that the Code's definition of the crime of escape conforms to that of a general intent type crime, "follow[ing] the prevailing law." *See* American Law Institute, Model Penal Code § 208.33 (Escape from Official Detention) at 133 (Tent. Draft No. 8, 1958).

atory of the common law or whether it expands on the common law, incorporating new elements.

It is clear from the statutory language itself and from the precedents that 18 U.S.C. § 751 carries over the common law elements of escape both as to the *actus reus* and the *mens rea.*

The statute uses only the word "escape" in defining the proscribed action. It does not further define this term. There are no adjectives modifying it, and there is no legislative history on its meaning. It is a basic canon of statutory construction that where an undefined term is used in a statute, it must be construed in light of its common law meaning, in the absence of evidence indicating a contrary meaning;[81] this is especially true in interpreting criminal statutes.[82] Where Congress borrows a term of art in which is accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the meaning its uses conveys to the judicial mind, and in such a case, in the absence of a contrary direction, its use may be taken as satisfaction with widely accepted definitions and not a departure from them.[83] Accordingly, it is clear as a matter of statutory construction, that *by defining an offense solely by reference to the word "escape", Congress intended to carry over the common law elements of the crime. Thus, escape under 18 U.S.C. § 751 must be deemed a "general intent" rather than a "specific intent" offense.*

This conclusion is supported by the clear weight of authority. A series of court of appeals cases has either explicitly or tacitly treated escape under § 751 as a "general intent" crime.[84] The majority cites the Seventh Circuit case of *United States v. Nix*[85] as sole support for the proposition that escape is a "specific intent" crime; however, analysis of the *Nix* decision demonstrates that it *does not* support the majority's position. The *Nix* case focused on the ongoing controversy concerning the availability of the intoxication defense. Under one view the intoxication defense is available only with respect to "specific intent" crimes. The modern and ascendant view, however, is that intoxication may serve as a defense to "general intent" crimes as well.[86] In the *Nix* case there were two defendants—Nix and Peterson: Nix was charged with "*attempted* escape"; Peterson was charged with "escape." Each claimed that they were intoxicated at the time of their offenses. Since *all attempt crimes require "specific intent,"* Nix claimed that he was entitled to an intoxication instruction. Peterson argued that the crime of "escape" should also be considered a "specific intent" crime so that he, too, would be entitled to an intoxication instruction. The court acknowledged that there was scarce authority for Peterson's "specific intent" argument, but held that the intoxication was available as a defense for both escape and attempted escape regardless of the specific or general nature of the intent element required for those crimes. It stated that there was *some* intent element required in escape cases and defined it as "the intent to avoid confinement." The court then stated: "*Whatever* label is placed on this intent, a defendant under § 751 is entitled to an instruction that includes this mental component as an element

**81.** *E. g., United States v. Zimmerman,* 71 F.Supp. 534 (E.D.Pa.1947). *See generally* 2A Sutherland Statutory Construction § 50.03 (4th ed. 1973).

**82.** *E. g., Levinson v. United States,* 47 F.2d 470 (6th Cir. 1931); *Simmons v. United States,* 120 F.Supp. 641 (M.D.Pa.1954).

**83.** *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

**84.** *United States v. Woodring,* 464 F.2d 1248 (10th Cir. 1972). *See United States v. McCray,* 468 F.2d 446 (10th Cir. 1972) ("The elements of the offense are (1) escape (2) from the custody of an institution where he is confined by direction of the Attorney General (3) pursuant to process issued under the laws of the United States by a court."); *United States v. Chapman,* 455 F.2d 746 (5th Cir. 1972); *Bayless v. United States,* 381 F.2d 67 (9th Cir. 1967).

**85.** 501 F.2d 516 (7th Cir. 1974).

**86.** LaFave & Scott § 45 at 343–344.

of the crime . . . . If the defendant offers evidence that he was intoxicated at the time of the offense, the jury must be instructed to consider whether he was so intoxicated he could not form an intent to escape."[87] In essence, then, the *Nix* court simply held that intoxication should be a defense to escape regardless of whether escape is a general or specific intent crime.[88]

In the course of its decision the *Nix* court defined the intent element of escape as the "intent to avoid confinement." On its face, this seems to be a *general* intent requirement. As already noted, the common-law general intent requirement for escape has usually been defined as the intent to depart from custody, the intent to go beyond permitted limits, or the intent to evade the due course of justice—the "due course of justice" being continued and uninterrupted confinement. The words "avoid confinement" seem to correspond completely with these definitions. There is nothing in this definition that suggests that an escapee must act with any ultimate motive or object in leaving confinement; on its face, it *does not require* an intent to avoid confinement

*permanently.* In short, the definition provided by the *Nix* decision of the mental element required in escape cases is no different from the traditional general intent to go beyond permitted limits.[89]

In sum, then, it is evident from the statutory language itself and from the precedents that escape from custody under 18 U.S.C. § 751 is a general intent crime. No federal court has held it to be a specific intent offense, in the sense of requiring that an escapee have an ultimate purpose beyond departure from confinement.

C. *The Relevance of Defendants' Evidence to the Intent Issue*

It remains to be determined whether defendants' evidence concerning fires, assaults, and medical care was relevant to the issue of intent.

If one thing is clear under the duress doctrine it is this: *compulsion does not negate general intent.*[90] As already discussed in Part III of this dissent, there are two types of defenses in criminal law. One type negates the elements of the crime; for ex-

---

87. 501 F.2d at 519.

88. Circuit Judge Pell's dissenting opinion in *Nix* clarifies the focus of that case as centering on the availability of the intoxication defense rather than on whether escape is a general or specific intent offense. He states:

> The only close aspect that I find in this case is that part of the court's instructions to the effect that if the defendant acted or failed to act because of intoxication it was not a defense. I do not quarrel, nor do I understand that the majority does, with the immediately preceding statement in the charge that the crime does not involve specific intent. I would accept the majority standard that escape is a voluntary departure from custody with an intent to avoid confinement.
>
> Looking at the record in the light of this standard I am convinced that Nix had a fair trial and that the jury found him guilty under instructions, which with the one questionable exception, properly were applicable under the standard stated in the majority opinion. While the reference to intoxication not being a defense might be prejudicially erroneous in some conceivable factual situations, I do not deem it so here.
>
> 501 F.2d at 520.

89. There *is* some language in *Nix* suggesting a "specific intent" requirement. This is treated

at p. —— of 190 U.S.App.D.C., at p. 1126–1127 of 585 F.2d, *infra.* It is important to note that the *Nix* court makes no effort to distinguish among certain fundamental concepts in criminal law. For example, it states: "A prisoner who has *no intent* to escape—because he is grossly intoxicated, or thinks his jailer has told him to leave, or mistakes the boundaries of his confinement, or has a gun held to his head by another inmate—is not likely to endanger society, *as a willful* escapee is." 501 F.2d at 519 (emphasis added). This statement, quoted approvingly by the majority, evinces confusion between those defenses which negate intent (*viz.* intoxication and mistake of fact) and those which do not negate intent but rather raise exculpating circumstances such as the impairment of "free will" (*viz.* duress). While this dissent identifies and defines the various concepts necessary for an intelligible definition of escape, such as intent, voluntariness, duress, volition, intent-negating defenses, and defenses of excuse or justification, the majority does not even seem to be conscious that these distinctions exist, and it is this confusion that has led the majority to do such violence to the duress doctrine and the concept of intent and "free will."

90. LaFave & Scott §§ 49–50.

ample, the intoxication defense is designed to negate the *mens rea* or intent element of an offense. The other type of defense negates criminal responsibility by raising some matter that justifies or excuses a technical violation of the law. Compulsion, duress, and necessity are defenses of this latter type. *The rationale for these defenses is not that the defendant, confronted with an unnerving threat of harm, does not "intend" to do what he does, but rather that, when his free will was impinged upon, he made the most socially useful choice between two evils.*[91] Rather than go to issue of intent, the doctrine of compulsion or duress goes to the issue of voluntariness and reflects a policy decision as to the point or stage up to which an individual under compulsion should be expected to resist pressure and act according to his own will rather than submit to the will of another. This policy decision involves consideration of the social utility of the individual's actions. As already pointed out, if A forces B at gunpoint to hit C, B is innocent of battery. He is innocent *not* because he was without the requisite intent—*he did intend to hit C*—but rather because he made the best choice under the circumstances.[92]

Since the crime of escape under 18 U.S.C. § 751 requires only a "general intent", namely the intent to depart from custody, it is clear that defendants' evidence regarding fires, assaults, and medical care was not relevant to the "intent" issue. Even assuming for the purpose of argument that defendants' evidence established overwhelming compulsion—the threat of imminent death—still, this would not negate defendants' intent. There is no doubt that defendants consciously and deliberately departed from prison and that they were aware of the nature of their actions. They freely admit this, and this is all that is required to establish the "intent" element required under 18 U.S.C. § 751. Accordingly, the trial court's instructions on the intent issue were entirely correct.

The majority's treatment of this issue is obscure. Adopting the *Nix* court's definition of escape, it holds that the intent element of the offense consists in the "intent to avoid confinement". It then concludes that "a jury can consider whether evidence of jail conditions, threats, and violence such as presented by appellants in the District Court raises reasonable doubts concerning a defendant's . . . intent to avoid confinement."[93]

---

**91.** *Id.*

**92.** The majority contends that the duress-necessity defenses reflect "two different general principles of exculpation." Maj. Op. at —— of 190 U.S.App.D.C., at 1097 of 585 F.2d. One of these principles, according to the majority, relates to "justification by choice of the lesser evil"; but the other principle, "exemplified by the notion of duress as compulsion, dictates that a person will not be held responsible for an offense he commits under threats or conditions that a person of ordinary firmness would have been unable to resist." The majority asserts that this latter principle "like the defenses of intoxication, insanity, and mistake, negates the intent or voluntariness elements of an offense." Maj. Op. at ———— of 190 U.S.App.D.C., at 1096-1098 of 585 F.2d. This assertion is simply wrong. Duress does not negate general intent. The *only* authority cited by the majority in support of its assertion is the *table of contents* of the draft Model Penal Code where the duress defense is covered under "Article 2: General Principles of Liability" while the necessity defense is treated under "Article 3: General Principles of Justification." This is not authority at all; and, indeed, nowhere in the Com-

mentary accompanying the Code's section on duress is it suggested that compulsion exculpates through the negation of intent. As already indicated in parts III and IV of this dissent, the doctrine of duress or compulsion goes to the issue of voluntariness rather than the issue of intent.

The fallacy of the majority's position can be easily demonstrated by contrasting two situations. In the first situation, C holds a gun to A's head and commands A to hit B. A does hit B. In the second situation, C holds a gun to A's head and commands A to kill B. A does kill B. A would most likely be excused for hitting B in the first situation but probably *would not* be excused for killing B in the second situation. If the majority's view that duress negates general intent is sound, how could these different results be explained? Clearly, if the compulsion in the first instance was sufficient to cancel A's general intent, why would not the same degree of compulsion be sufficient in the second instance?

**93.** Maj. Op. at —— of 190 U.S.App.D.C., at 1094 of 585 F.2d.

The majority's use of the phrase "intent to avoid confinement" is somewhat ambiguous. On its face, it seems to mean nothing more than the intent to depart from prison or the intent to go beyond permitted limits; it does not appear to require any ultimate purpose of objective beyond departure from custody. If this reading is correct, then the phrase is consistent with traditional formulations of the intent element required in escape cases and calls only for a "general intent." If this is what the majority means by the phrase, then plainly it is dead wrong in its assertion that evidence of compulsion is relevant to such intent in view of the elementary precept that compulsion does not negate general intent.

However, there are indications that the majority is investing the phrase with more meaning than is apparent on its face. It seizes upon and emphasizes the *Nix* court's statement that "most courts, confronted with evidence that a defendant could not or did not form an intent to leave *and not return,* have held such an intent essential to proof of the crime of escape." [94] This suggests that the majority is equating an "intent to avoid confinement" with an "intent to leave and not to return"; in other words, by the phrase "intent to avoid confinement" the majority may really mean "intent to avoid confinement *permanently*." Indeed, *this is the position urged by defendants in the trial court and on appeal.* Under this reading, a prisoner could *only* be held guilty of escape if it could be proved that, at the time he left prison he *never* intended to return again. However, the majority denies, *though* somewhat feebly, that it is adopting this definition of the intent element. It acknowledges that "[d]escribing the requisite intent for escape as an 'intent to leave and not to return' is not completely satisfactory since it might not cover a prisoner who intends to take an unauthorized temporary leave of absence." [95]

The majority has conjured up a wholly novel definition of the intent element of escape, however. Still fastening on the *Nix* court's phrase "intent to avoid confinement," the majority asserts that the intent required under 18 U.S.C. § 751 is *neither* the general intent to go beyond permitted limits, reflected in the trial court's instructions, *nor* the specific intent to avoid confinement permanently, urged by defendants. Rather, according to the majority, the intent element of escape is defined by reference to the nature of prison conditions:

> The word "confinement" describes the most common form of punishment prescribed by our legal system. Jurors are readily aware that a person serving a

94. Maj. Op. at —— of 190 U.S.App.D.C., at 1092 of 585 F.2d, citing *United States v. Nix,* 501 F.2d at 518.

95. Maj. Op. at —— n. 13 of 190 U.S.App.D.C., at 1092 n. 13 of 585 F.2d. It is correct for the majority to reject the defendant's contention that the intent element of escape under 18 U.S.C. § 751 is the "intent to avoid confinement *permanently.*" Such a requirement would clearly be contrary to the common law and unsupported by either the statutory language of 18 U.S.C. § 751 or by the case law interpreting that section. The only conceivable authority for defendants' position is the careless and inaccurate statement in the *Nix* case suggesting that "most courts" have found that an "intent to leave and not return" is "essential to proof of the crime of escape." The *Nix* court cites four cases in support of this statement: *Gallegas v. People,* 159 Colo. 379, 411 P.2d 956 (1966); *People v. Dolatowski,* 94 Ill.App.2d 434, 237 N.E.2d 553 (1968); *Chandler v. United States,* 378 F.2d 906 (9th Cir. 1967); and *Mills v. United States,* 193 F.2d 174 (5th Cir. 1951), *cert. denied,* 343 U.S. 969, 72 S.Ct. 1067, 96 L.Ed. 1365 (1952). In point of fact, *none* of these cases hold, or even suggest, that a specific intent not to return to prison is part of the intent element of escape. I have found no court, state or federal, that holds that a specific intent not to return is an element of escape. Of course, the most condemning feature of the defendants' position is that it is patently absurd. Even the majority grudgingly recognizes this. Under the defendants' approach a prisoner would be entitled to take a "temporary" leave of absence from prison whenever he desired. As long as he ultimately intended to return he would not be violating the law. It takes little imagination to see what this would do to 18 U.S.C. § 751. Thus, for example, if a young inmate decided that he did not want to waste his youth serving a 20-year prison sentence, he could lawfully leave prison as long as he intended to return at the age of 65 to serve out his term. Clearly, this notion of escape is fanciful.

sentence for a crime is "confined"—*i. e.,* his liberty is restricted—in certain fundamental ways. For example, he cannot leave the institution wherein he is confined, he cannot come and go as he pleases, his daily schedule is subject to various controls, his privacy is substantially curtailed, and he is subject to strict discipline. One who leaves custody without permission to see his mother who is ill or to improve his menu (assuming the prison fare is within reason) has an intent to avoid confinement since restricted contact with relatives and a reasonably limited choice of diet are normal incidents of confinement. Furthermore, a prisoner who leaves custody to take even a temporary "leave of absence" from the normal conditions of confinement possesses the requisite intent for escape. On the other hand, if a prisoner offers evidence to show that he left confinement only to avoid conditions that are not normal aspects of "confinement"—such as beatings in reprisal for testimony in a trial, failure to provide essential medical care, or homosexual attacks—the intent element of the crime of escape may not be satisfied. When a defendant introduces evidence that he was subject to such "non-confinement" conditions, the crucial factual determination on the intent issue is thus whether the defendant left custody only to avoid these conditions or whether, in addition, the defendant *also* intended to avoid confinement. In making this determination the jury is to be guided by the trial court's instructions pointing out those factors that are most indicative of the presence or absence of an intent to avoid confinement.[96]

Thus, under the majority's approach, in order to determine whether a particular defendant has satisfied the intent element under 18 U.S.C. § 751, three inquiries must be made. First, what condition or factor prompted the defendant to depart from custody? Second, was this condition a "normal incident of confinement"? And, third, was the defendant's departure prompted "only"

by this factor or condition? Apparently, the majority believes that if a defendant's departure from prison is prompted solely by "non-confinement conditions", that he has not "intended" to escape from prison. In short, the majority holds that the intent required under 18 U.S.C. § 751 is the *specific intent* to depart from "confinement conditions," rather than from "non-confinement conditions."

As strained as the majority's approach is, it is understandable. My colleagues are apparently prepared to labor mightily to exculpate these defendants. They have come to realize that the defendants' flimsy duress defense does not pass muster under traditional standards. Undeterred, however, they have looked about for some other avenue for raising the "duress issues"; for some reason, they have decided to work under the rubric of "intent." Here, however, they have run up against the simple fact that escape is a general intent crime and the fundamental principle that duress or compulsion does not negate general intent. The problem remains: How does one make issues of duress relevant to intent? My colleagues have now found a way to solve this problem; they contrive to redefine the intent element of escape by direct reference to duress. Various prison conditions, which *might* have given rise to a duress defense *once the escapee had returned to custody,* are now identified by my colleagues as "non-confinement conditions." And other prison conditions, which would not have given rise to a duress defense, are termed "confinement conditions." If a prisoner's departure from prison is prompted by duress-inducing conditions, he has *not* "intended" to escape. If a prisoner's departure is prompted by other conditions, however, he *has* "intended" to escape. *Voila!* Matters of duress are now directly relevant to the issue of intent. Modestly, the majority relegates this legerdemain to a footnote.

There are several problems with the majority's approach. The most serious one is that it has no foundation in the law.

**96.** Maj. Op. at —— n. 17, of 190 U.S.App.D.C., at 1093, n. 17 of 585 F.2d.

First, it is clearly contrary to the common law. It has *never* been an element of escape at common law that an escapee have a specific intent to avoid "the normal incidents of confinement"; all that is required is an intent to go beyond permitted physical limits, and this is a general intent requirement.

Second, it is directly in conflict with innumerable cases holding that prison conditions, no matter how rank and intolerable, do not affect liability for escape.[97]

Third, there is absolutely nothing in 18 U.S.C. § 751 that suggests adoption of this novel element. The statute uses only the word "escape" to define the offense, and, in the absence of a contrary indication, that term must be construed according to its common-law meaning.

Fourth, there is *no* case law holding that a specific intent to avoid "the normal incidents of confinement" is an element of escape under 18 U.S.C. § 751. I invite the majority to cite one authority, state or federal, that even hints at this position.

Fifth, the majority's position is conceptually unsound. Even if the distinction between "confinement conditions" and "nonconfinement conditions" is valid, it is incorrect to say that a defendant does not *intend* to avoid confinement conditions simply because his immediate purpose is to avoid non-confinement conditions. A defendant "intends" what he knows to be the necessary consequences of his actions. Thus, even though a prisoner's primary or sole purpose is to avoid "non-confinement conditions," he can only do so—and he knows he can only do so—by avoiding legitimate confinement conditions as well. When and if he leaves prison, this prisoner "intends" to depart from "confinement conditions" even though his *motive* is to avoid non-confinement conditions. The majority unfortunately confounds "motive" with "intent."

There is also a practical problem inherent in the majority's approach. In order to ascertain the "intent" of the defendant—his *subjective* state of mind—the majority's decision necessitates embroiling the fact-finder in an inquiry into the boundaries between normal prison conditions and abnormal prison conditions. I submit this inquiry is irrelevant to the issue of intent. The severity of prison conditions *is relevant* to the issue whether the defendant has been subject to duress or compulsion, and in this context the question is not whether a particular condition is or is not a "normal" incident of prison life, but, rather, whether the condition is such as to raise in the defendant's mind a well-grounded apprehension of serious bodily injury or death.

In sum, then, it is indisputable that escape under 18 U.S.C. § 751 is a general intent crime. It is also clear that evidence of compulsion, while perhaps relevant to an affirmative defense of duress or necessity, does not negate *general* intent. If the majority insists that escape is a specific intent crime, I submit this is totally without support in legal precedent and the inescapable practical results are a demonstrable absurdity. Consequently, the majority's theory that evidence of duress, though insufficient to make out a duress defense, should nevertheless be presented to the fact-finder as relevant to the defendants' intent is simply wrong.

On analysis, then, my view of the majority position is this:

1. The defense of duress cannot be validly asserted by these defendants, because (a) there was never any attempt by defendants to turn themselves in to appropriate authorities, and further, (b) such evidence as was offered by defendants was insufficient as a matter of law to make out a duress defense since it fails every previous legal test with respect to the severity and immediacy of the "compulsion."

2. Apparently realizing the weakness of defendants' position under any accepted standard of duress, the majority attempts to construct a new haven for escaped crimi-

---

97. *E. g., State v. Davis,* 14 Nev. 439 (1880); *Hinkle v. Commonwealth,* 23 Ky.Law Rep. 1988, 66 S.W. 816 (1902).

nals under the rubric of "voluntariness." This likewise fails, because the law has always been that the proper avenue for approaching issues of "voluntariness", or "free will", is through the affirmative defense of duress in cases such as this in which defendants claim that they were deprived of free will by force of circumstances or the threats of other persons. The doctrine of duress was created specifically to deal with such issues.

3. Finally, the only meaningful way in which the majority's discussion of intent can be interpreted—and the only construction which could conceivably assist defendants here—is that the majority imposes a specific intent requirement on the crime of escape, and includes therein an intent to avoid "the normal incidents of confinement." However, such a requirement has never before been found in the federal courts; its practical application would make a mockery out of the federal escape statute. The majority's theoretical edifice in this opinion is not only unprecedented: it is unworkable.

I respectfully dissent.